**WALLING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. L. WIEMANN CO.**

No. 533.

District Court, E. D. Wisconsin.

Feb. 5, 1943.

Frank J. Delany, Acting Regional Atty., of Chicago, Ill., Irving J. Levy, Acting Sol., of Washington, D.C., and Victor M. Harding, Jr., of Chicago Office of Department of Labor, of Chicago, Ill., for plaintiff.

Morris Karon, of Milwaukee, Wis., for defendant.

DUFFY, District Judge.

This is an action instituted by the Administrator of the Wage and Hour Division, Department of Labor, to restrain the defendant from violations of various provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

Defendant is a Wisconsin corporation which owns and operates sixteen retail stores in Wisconsin, twelve of which are located in Milwaukee, and the other four are located at Fond du lac, Green Bay, Racine, and Madison. Defendant also owns and operates in the city of Milwaukee a two-story building erected in 1938, which is known as the general office and warehouse. Prior to 1938, part of the store on Twelfth Street in Milwaukee was used for offices for the executives of the company as well as for storage of merchandise which was to be redelivered to the other stores.

On the first floor of the general office and warehouse, three buyers have desk space; the balance is warehouse space devoted to the receipt, storage, and transfer of goods, in which work four employees are engaged. The second floor contains the private offices of the defendant's officers, and desks for the clerical staff of six female employees. From here the executives supervise generally the activities of the company.

This office and warehouse is not open to the general public. No goods are sold or displayed there. Merchandise is ordered for delivery to the warehouse in order to save freight charges by reason of larger volume shipments, and because manufacturers are often unwilling to ship the small quantities which would satisfy the requirements of an individual retail store. From 80% to 85% of all merchandise purchased by the company is shipped in from outside the State of Wisconsin. Manufacturers, rather than wholesalers or jobbers, supply 90% of the company's merchandise.

The officials in the general office control the purchasing. They are assisted by the clerical employees, a part of whose work involves the procurement of and the payment for merchandise. The buyers make up what is known as a "listing" for each manufacturer from whom goods are regularly purchased. For ready reference these listings are made up in permanent form, and are also mimeographed upon order blanks which are supplied to the manager of each store and which he uses in making his selection when ordering merchandise. Orders placed by store managers are made out in duplicate, one copy being retained by the manager and the other forwarded to the general office for approval or disapproval. Unless an order from a single store is consolidated with orders from other stores on the same manufacturer into a larger order, upon its approval, the order which has been executed by the store manager is sent on to the manufacturer; but when orders of various stores are consolidated into a single order, a new order is made up combining them. Consolidated orders usually specify the warehouse as the place of delivery. Twenty percent of the merchandise purchased by the company is delivered in the first instance at the warehouse for a division and distribution among the various stores.

All warehouse employees perform work necessary to the receipt of merchandise and necessary to its distribution and transfer to the individual stores. Goods are delivered to the warehouse directly from the factory by motor carrier, or by a combination of rail and motor carrier. There is no unloading platform at the warehouse. The merchandise was unloaded from the trucks to the floor of the warehouse. The warehouse men had instructions from officers of defendant not to assist in unloading the trucks. It was customary for trucks to back up to the unloading door, and the tail gates of the trucks when open would usually extend into the warehouse. Heavier crates and packages would be skidded from the truck to the floor of the warehouse. Smaller packages would at times be handed by the trucker to a warehouse man who remained entirely within the warehouse during the unloading process. At other times the trucker would himself place the package on the warehouse floor. The merchandise would then be unpacked and checked. In the warehouse there were a series of bins, one or more of which had been assigned to each store. The merchandise would then either be placed in the appropriate bin or would be placed upon shelves for a later transfer to the bins.

Invoices pertaining to shipments of merchandise come in by mail and are checked against orders in the general office to determine that the company is being properly charged. The retail price is figured at the general office and noted on the invoice, as is also the proportionate part of the purchase price and freight expense to be charged to each store. A "distribution" is stamped upon the invoices, indicating the division of the shipment among the various stores. The invoice is then transmitted from the general office employees to the warehouse men.

When invoices have been checked by the warehouse employees against the goods actually delivered, they approve same and forward to the general office for payment. These employees also mark containers of merchandise with the retail selling price which has been figured in the general office. Each shipment of merchandise from the warehouse to the retail stores is recorded by warehouse employees upon an invoice charging the stores with the merchandise sent them. The average stay of goods in the warehouse is approximately ten days. Shipments are received by and sent out from the warehouse almost daily.

A small part of the work of the girls in the office was the making out of orders or invoices, and paying for the goods which had been received from outside the State. The greater portion of their time, however, was used in taking dictation, typing letters, checking invoices, bookkeeping, computing and checking the salaries of the more than 400 employees in the defendant's sixteen stores, preparing sales statements of the stores, checking bank statements and deposit slips, taking care of callers at the office, preparing inventory records and insurance reports, and at certain times of the year preparing income tax reports, O.P.A. reports, and other State and government reports. An actual ten-day record of the work of the office girls was kept, which was representative of their work throughout the year and which demonstrated that more than 80% of their time was incidental to the retail functions of the defendant.

■ We are here concerned with the question of whether the four warehouse men and the six office girls were covered by the provisions of the Fair Labor Standards Act. In making this determination, the nature of the employer's business is not the deciding factor, but rather the character of the employees' activities determines whether the act applies. A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S. Ct. 332, 87 L.Ed. ——; Overstreet et al. v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. ——.

■ In considering the many cases which have been cited, some of which were under other statutes which had to do with activities which affected commerce, we must keep in mind that in enacting the Fair Labor Standards Act, Congress did not choose to exert its power to the full by regulating industries and occupations which merely affect interstate commerce. A. B. Kirschbaum Co. v. Walling, supra; Walling v. Jacksonville Paper Co., supra; Overstreet et al. v. North Shore Corp., supra.

The attorneys for both sides have cited and commented upon the case of Walling v. Goldblatt Bros., Inc., 7 Cir., 128 F.2d 778, certiorari denied 318 U.S. 757, 63 S.Ct. 528, 87 L.Ed. ——. The defendant in that case owned and operated three warehouses in Chicago and distributed goods and merchandise therefrom to ten extensive department stores, two of which were located in the State of Indiana. Some manufacturing operations were carried on in the warehouses.

The court there emphasized the principle that in order to come within the provisions of the Fair Labor Standards Act employees must be engaged in commerce or in a process or occupation necessary to the production of goods for commerce, but pointed out that it is not sufficient that these activities merely affect commerce.

■ Considering first the four warehouse men (who are designated as stockboys by the defendant), it is clear that if they engaged in unloading the trucks they would be within the act. Walling v. Goldblatt Bros., Inc., supra, 128 F.2d at page 782. If the defendant in the instant case had a warehouse platform on which goods would be unloaded, the situation would be similar to that in the Goldblatt case. The court there pointed out that when goods were deposited on the platform, their interstate journey was at an end. Since the warehouse which we are now considering had no platform, the crates and packages were deposited through a doorway onto the warehouse floor. The defendant's employees were warned, because of certain insurance coverage, that they must not assist in the unloading of the trucks. As to the crates and heavier packages which were skidded from the trucks to the warehouse floor, as well as to the packages placed on the floor of the warehouse by the trucker, there can be no question that the work of the warehouse men did not bring them within the act. I do not believe that, because occasionally the trucker handed a package to an employee, who stood entirely within the warehouse, instead of dropping it on the warehouse floor, such action can cause any substantial difference in the situation we are considering.

134

The following statement in the Goldblatt opinion, 128 F.2d at page 782, is applicable: "* * * Here, once the goods reached the warehouses, they assumed a wholly local character. The function of the warehouses was to furnish activities and means for the conduct of a relatively local retail business conducted by one company. This function was that of an ordinary warehouse for a retail establishment and bears no resemblance to a 'throat' or a 'current of commerce.' Upon delivery to the warehouse, interstate commerce ceased. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97, A.L.R. 947; * * *."

Another case in point is Veazey Drug Co. v. Fleming, D.C., 42 F.Supp. 689. The plaintiff there operated twenty retail stores in Oklahoma City and maintained a central warehouse to which all merchandise purchased by plaintiff (instead of 20% as in the instant case) was shipped. Most of the goods received at that warehouse came from without the State. The employees involved were employed in the warehouse and performed duties similar to those in the instant case. The court there held that the employees were exempt from the act for two reasons: first, because the warehouse was a part of the company's retail establishment which was exempt; and, secondly, because the activities of the employees were not in interstate commerce. See also Duncan v. Montgomery Ward & Co., D.C., 42 F.Supp. 879, where the warehouse was held to be a part of defendant's retail establishment. I, therefore, conclude that the duties and activities of the warehouse men or stockboys did not bring them within the purview of the Fair Labor Standards Act.

■■ As to the six office employees, we can again be guided by the opinion in the Goldblatt case. The court there stated (128 F.2d at page 782): "Where orders are solicited within a state and the goods are shipped from without the state directly to the customer or to an agent for delivery to the customer the transactions are a part of interstate commerce until the goods reach the customer. (Citing cases.) But here there were no such prior orders. Defendant knew in advance from its records, in a general way the needs of the retail stores and acted accordingly. But defendant was not relying on existing orders from its stores or customers. The goods arrived at the warehouses and came to rest. They were not destined for any specific customer or store. The mere fact that an anticipated local transaction causes movement in interstate commerce is not sufficient to constitute the wholly local transaction after arrival a part of commerce. (Citing cases.) Where goods are delivered to the buyer to be sold later and delivered to intrastate buyers subsequent acts are not commerce. (Citing cases.)"

■ In the instant case some orders from the store managers, after being approved by the officers of the defendant, were forwarded to the manufacturer. Undoubtedly the defendant would know in advance what particular store had ordered goods when same came to the warehouse. While it is not as clear that the activities of these six employees would not be covered by the act as in the case of the warehouse men, I am of the opinion that they are exempt under Sec. 13(a) (2) of the act, which provides that Secs. 6 and 7 shall not apply to "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." The defendant's stores and the general office and warehouse building together constitute a single retail establishment. The general office and warehouse building is the executive and record center, in addition to furnishing storage space for some 20% of the goods purchased by defendant. The activities now carried on in this central building were formerly carried on in one of its stores, and the change was made in the interest of convenience, efficiency, and economy. The evidence shows frequent temporary and some permanent transfers of employees between the stores and the general office and warehouse building. The accounting and inventory records, sales records, and federal reports are integrated for the entire business of the defendant. I reach the conclusion that the six office employees are exempted from the act. It, therefore, follows that defendant is entitled to judgment dismissing the complaint.