Addilee PARKS, Plaintiff,

v.

W. S. PUCKETT and Twila Puckett, doing business as Proctor Potato Chip Company, a Partnership, Defendants.

Civ. A. 336.

United States District Court
W. D. Arkansas,
Fayetteville Division.

Sept. 27, 1957.

J. Wesley Sampier, Rogers, Ark., for plaintiff.

Wade & McAllister, Fayetteville, Ark., for defendant.

JOHN E. MILLER, District Judge.

## Findings of Fact

### 1.

The plaintiff is a citizen of the State of Arkansas and resides near the City of Rogers, Arkansas. The defendants are each citizens of Arkansas residing in the City of Rogers, Arkansas. This is an action by the plaintiff to recover unpaid minimum wages and overtime compensation allegedly due her by defendants under the provisions of the Fair Labor Standards Act.

### 2.

The defendant, W. S. Puckett, was the owner of the business known as Proctor Potato Chip Company located in the City of Rogers, Arkansas. The defendant, Twila Puckett, is the wife of W. S. Puckett and occasionally assisted him in the operation of the company, but had no ownership therein.

The principal business of the Proctor Potato Chip Company was the manufacture and distribution of potato chips. In addition, however, the company also distributed pickles, salad dressing, mustard, pork skins, corn sticks, and similar items.

Most of the ingredients for the potato chips were purchased from other states and shipped into the State of Arkansas. All the pickles, pork skins, and other items were purchased from producers in other states and shipped to the defendant's place of business in the State of Arkansas. The defendant company sold the potato chips and the various other items to stores, schools, and retail establishments in three counties in northwest Arkansas. The defendant, W. S. Puckett, and his employee, B. B. Bland, each called on the customers and when a sale was made the article was simultaneously delivered. In all there were approximately 350 retail establishments in the said three counties. One of the defendant company's customers was located within a short distance of the Missouri state line, and another of said customers was located within three miles of the Oklahoma state line. Puckett and Bland each operated a truck and in the mornings they would load their trucks with a sufficient quantity of potato chips, pork skins, etc., for that particular day. They would go into the various stores, look at the racks to see if additional items were needed, and advise the store owner of his requirements. The merchandise was paid for in cash.

During the two years in question, 1955 and 1956, the customers of the defendant company remained fairly constant, and there was very little change in the volume of business done with the various stores.

3.

The plaintiff, Addilee Parks, and three other women were responsible for the manufacture and packaging of the potato chips. The various jobs or duties were rotated and in general consisted of frying the potatoes in vegetable oil; salting, weighing, sacking, and packing the potato chips in pasteboard boxes.

4.

In addition to her duties with respect to manufacturing and packing the potato chips, plaintiff also did some cleaning or janitorial work in the rooms where the potato chips were cooked and sacked, and occasionally she did some cleaning work in the room in which the pickles, corn sticks, and similar items were stored. Occasionally plaintiff would roll an empty cooking-oil barrel approximately forty feet from where it had been placed near the cooker to the back door of the building. And on approximately 19 occasions the plaintiff signed receipts for cooking oil or salad dressing which was being delivered to the defendant company by Jones Truck Lines or by Arkansas Motor Freight Lines. It was actually the duty of Mrs. Ruth Morris, Foreman, to sign the receipts, but when she was busy she would request the plaintiff to sign the receipts for her when delivery had been made.

5.

The receipts referred to in Finding of Fact No. 4 were for cooking oil and salad dressing which had been shipped from St. Louis, Missouri, to the defendant company in Rogers, Arkansas. The oil was shipped in 55-gallon barrels and would be delivered to the defendant company by Jones Truck Lines or Arkansas Motor Freight Lines. The trucker would unload the barrels and place them in the room where the cooker was located or in a storage room nearby.

He would then have someone sign a receipt for the oil, and as above stated on 19 occasions the plaintiff signed such receipts. Plaintiff did not actually check to ascertain whether all the merchandise had been delivered.

Sometimes there would be as many as ten barrels of oil in the store room, since the defendant, W. S. Puckett, would buy extra oil when the price was lower.

The plaintiff and other employees used a pump to pump the oil into the cooker, and oil was used out of each barrel until it was empty. Then the pump would be changed to another barrel. During the two years in question the defendant company used approximately 1½ barrels of cooking oil each week.

After the barrels were empty the employees would roll the empty barrels out the back door, and as above stated the plaintiff occasionally rolled an empty barrell to the back door to make room for the placing of a full barrel alongside the cooker. The empty barrels weighed approximately 40 to 50 pounds and were fairly easy to handle. After the barrels were rolled out the back door they remained there until they were picked up by Jones Truck Lines or Arkansas Motor Freight Lines and returned to St. Louis, Missouri. Some of the barrels were disposed of locally but apparently a majority of them were returned to St. Louis. The evidence did not disclose what the agreement was, if any, between the defendant company and the seller in St. Louis with respect to the ownership of the barrels or the credit, if any, given by the seller to the defendant company for returning said barrels. The truck lines had no specific schedule for picking up the barrels, and sometimes they would not go to the defendant company's place of business for as long as four weeks.

6.

From January 3, 1955, until May 4, 1956, plaintiff worked for the defendant company, receiving as wages $18 per week. From May 4, 1956, until December 21, 1956, she worked for the defendant company at a salary of $20 per week.

In addition to her salary she received a $10 Christmas bonus in 1955 and a $20 Christmas bonus in 1956. In many weeks she worked in excess of 40 hours but received no overtime compensation. The plaintiff attempted to keep records of the hours she worked each day, but the records she kept were not entirely accurate. The defendants, W. S. Puckett and Twila Puckett, kept no record of the hours worked by plaintiff.

The employees had no fixed hours of work. They usually arrived in the morning sometime between 7:00 and 8:00 o'clock, and quit work whenever they completed the requirements of that particular day. The plaintiff ordinarily took from 10 to 20 minutes for lunch. From all the evidence it appears that if plaintiff was entitled to receive the minimum wage and overtime provided by the Fair Labor Standards Act, she has been underpaid the sum of $2,000 for the period in question.

### 7.

On October 5, 1956, the defendant company was investigated by the Wage and Hour investigators, and subsequent to that investigation the defendant, W. S. Puckett, asked the plaintiff to discontinue receipting for merchandise and to discontinue rolling the empty barrels out the back door.

### 8.

Mr. and Mrs. Puckett spent very little time at the defendant company's place of business. Most of Mr. Puckett's time was spent calling on customers, and Mrs. Puckett only worked intermittently. When they were gone Mrs. Morris was in charge of the operation.

### 9.

All the merchandise sold by the defendant company was sold in the State of Arkansas.

Some of the items would remain in defendant's place of business for as long as six or eight months before they were sold.

## Discussion

The statutes pertinent to the issues in this case are as follows:

29 U.S.C.A. § 203, contains the following definitions:

"(b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof.

\* \* \* \* \* \*

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

Section 206 provides as follows:

"(a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—

"(1) not less than $1 an hour;"

The $1 an hour became effective March 1, 1956, the rate prior to that time being 75 cents an hour.

Section 207 provides:

"(a) Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

Section 211 requires an employer subject to the Fair Labor Standards Act

to make, keep and preserve records of the wages, hours, and other conditions of employment of its employees.

Section 216 provides:

"(b) Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."

The section also provides that the court may allow plaintiff a reasonable attorney's fee and costs.

With these statutes in mind the Court must determine whether plaintiff comes within the coverage of the Fair Labor Standards Act. The following quotations set forth the general rules for the guidance of the Court.

In Chambers Construction Co. v. Mitchell, 8 Cir., 233 F.2d 717, 720, 722, the court said:

"Appellants assert, correctly, that 'the nature of the employer's business is not determinative, the application of the Act depending upon the character of employees' activities and not the nature of the employer's business.'"

"The test, as set out in Vollmer and prior thereto is: 'Whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity. See McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1251, 87 L.Ed. 1538.' We consider this test inapplicable where coverage is bottomed on 'production of goods for commerce'. It is necessary, then, to determine only if the worker was engaged in producing goods for commerce, * *."

In McLeod v. Threlkeld, 319 U.S. 491, at page 497, 63 S.Ct. 1248, at page 1251, 87 L.Ed. 1538, the court said:

"The test under this present act, to determine whether an employee is engaged in commerce, is not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it. Employee activities outside of this movement, so far as they are covered by wage-hour regulation, are governed by the other phrase, 'production of goods for commerce'.

"It is not important whether the employer, in this case the contractor, is engaged in interstate commerce. It is the work of the employee which is decisive."

In Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, at page 429, 75 S.Ct. 860, at page 862, 99 L.Ed. 1196, the court said:

"The question whether an employee is engaged 'in commerce' within the meaning of the present Act is determined by practical considerations, not by technical conceptions. See Walling v. Jacksonville Paper Co., 317 U.S. 564, 570, 63 S.Ct. 332, 336, 87 L.Ed. 460; Overstreet v. North Shore Corp., 318 U.S. 125, 128, 130, 63 S.Ct. 494, 496, 497, 87 L.Ed. 656. The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity."

■ When the facts in the instant case are viewed in the light of the statutes and of the general rules established by the decisions, it immediately becomes apparent that plaintiff was not engaged in the production of goods for commerce. All the merchandise handled by the defendant company was sold in the State of Arkansas; none was sold outside the State of Arkansas and none was sold to retailers for resale outside the State of Arkansas. And a mere showing by plaintiff that the defendant company sold

merchandise to one retail establishment near the Missouri state line and to one retail establishment within three miles of the Oklahoma state line falls far short of proving that said defendant was engaged in the production of goods for commerce. There is no evidence that a single item of merchandise produced by the defendant company ever crossed state lines.

Plaintiff also contends that there was such a continuity of movement of some of the merchandise from out-of-state manufacturers to the defendant company's customers that said company was engaged in commerce under the holding of Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460. This contention of plaintiff is also without merit.

In the Jacksonville Paper Co. case some of the merchandise was shipped direct from the out-of-state manufacturer to defendant's customers, and some of it was purchased on special orders from customers. In the instant case, however, no merchandise was shipped directly from an out-of-state manufacturer to the defendant company's customers and no merchandise was purchased on special orders from customers. In fact, some of the merchandise remained in the defendant company's place of business for as long as six or eight months before it was sold to defendant's customers. In Schwarz v. Witwer Grocer Co., 8 Cir., 141 F.2d 341, certiorari denied 322 U.S. 753, 64 S.Ct. 1265, 88 L.Ed. 1583, the court had under consideration a similar case. At page 344 of 141 F.2d the court said:

"Plaintiff's complete misconception of the Walling case appears in his brief in the paragraph reading: '* * * a wholesale grocer imports goods for one purpose only, to sell such goods to the retailer who, in turn, sells to the ultimate consumer. Therefore the goods in the warehouse of the Cedar Rapids branch were only pausing momentarily before being delivered to the ultimate consumer. The Walling

case is authority for the fact that such goods are in commerce until they arrive on the shelves of the retailer.' But, as we have seen, the Walling case had to do with goods in 'practical continuity of movement' through the warehouse to 'the customers for whom they are intended,' i. e. for whom they were intended from the beginning of the movement. The case has no reference to goods coming to rest in a wholesaler's warehouse in the ordinary way. Such an interpretation expressly is rejected. Moreover there is nothing in the Findings of Fact in the present case nor in the underlying record to support the assertion that the goods in defendant's warehouse paused there only 'momentarily'. They may have rested in the warehouse days or weeks or months or even years."

To the same effect see, Walling v. Goldblatt Bros., 7 Cir., 128 F.2d 778, certiorari denied 318 U.S. 757, 63 S.Ct. 528, 87 L.Ed. 1130.

The real question in the case is whether the plaintiff was engaged in commerce, that is, whether her activities were so closely related to the movement of commerce as to be a part of it.

The Court is convinced that plaintiff was not engaged in commerce within the meaning of the Act. In two years time the sum total of plaintiff's work which in anywise could remotely be connected with interstate commerce was the signing of 19 receipts for goods which had been shipped in interstate commerce and the momentary handling of an undetermined number of empty barrels (approximately one per week or less), some of which were subsequently shipped in interstate commerce.

With regard to the signing of receipts, at the time said receipts were signed the barrels or drums had already been placed in defendant's building and had come to rest. Plaintiff did not assist in unloading merchandise and did nothing more than sign receipts for it after it had been placed in the building.

In Walling v. Goldblatt Bros., supra, the court held that goods lose their interstate character when they are actually unloaded and deposited on a warehouse platform. Workers handling the goods prior to that time are engaged in interstate commerce; those handling the goods after they have been placed on the warehouse platform are not engaged in interstate commerce.

In Walling v. L. Wiemann Co., D.C. Wis., 52 F.Supp. 131, affirmed 7 Cir., 138 F.2d 602, the court followed the Goldblatt Bros. case, supra, and held that no interstate commerce was involved on the part of the warehouse men, even though occasionally the trucker would hand a package to a warehouse man instead of dropping it on the warehouse floor.

In the instant case the goods had come to rest and had lost their interstate character prior to the time plaintiff signed the receipts.

With regard to the plaintiff's handling of empty barrels, the Court is likewise of the opinion that no interstate commerce was involved. Plaintiff did not load the empty barrels onto any vehicle for transportation in interstate commerce. All she did was roll them out of the building so that they would not be in the way and new barrels could be set in their place. After the barrels were rolled out the back door they remained on the ground for an indeterminate period of time. As stated in Finding of Fact No. 5, the truck lines had no specific schedule for picking up the barrels, and sometimes they did not go to the defendant company's place of business for as long as four weeks. The barrels did not begin their interstate journey until they were actually picked up by the truck lines for delivery to St. Louis, Missouri.

The case of Klotz v. Ippolito, D.C.Tex., 40 F.Supp. 422, is not decisive. In that case the plaintiff actually assisted in unloading the beer from railroad cars and barges into defendant's warehouse and in loading the empty containers on the railroad cars for shipment back to the beer manufacturers, whereas in the instant case the plaintiff had nothing whatsoever to do with loading or unloading the barrels. For other cases similar to the Ippolito case see, Mitchell v. Royal Baking Co., 5 Cir., 219 F.2d 532; Stewart-Jordan Distributing Co. v. Tobin, 5 Cir., 210 F.2d 427, certiorari denied 347 U.S. 1013, 74 S.Ct. 866, 98 L.Ed. 1136.

Plaintiff makes the further contention that there was a continuous movement of the barrels in interstate commerce, but there was absolutely no evidence that the defendant company had any obligation to return the barrels to the manufacturer, and in fact some of the barrels were disposed of locally.

Moreover, even if the signing of the small number of receipts and the rolling out of approximately one barrel a week constituted activity in interstate commerce, such activities were so insubstantial and sporadic that plaintiff would not be covered by the Act. In this connection, in Walling v. Jacksonville Paper Co., supra, the court beginning at page 571 of 317 U.S., at page 337 of 63 S.Ct. said:

"The fact that all of respondent's business is not shown to have an interstate character is not important. The applicability of the Act is dependent on the character of the employees' work. Kirschbaum Co. v. Walling, supra, 316 U.S. [517] at page 524, 62 S.Ct. [1116] 1120, 86 L.Ed. 1638. If a substantial part of an employee's activities related to goods whose movement in the channels of interstate commerce was established by the test we have described, he is covered by the Act."

And in Schwarz v. Witwer Grocer Co., supra, the court at page 344 of 141 F.2d said:

"The benefits of the Act are for employees engaged in interstate commerce. These employees, therefore, must have proved that they were engaged in interstate commerce or that 'a substantial part of [their] activities' was in interstate commerce. They only proved that a very incidental part of their ac-

tivities was in such commerce. They failed to make a case."

See also, Mitchell v. Welcome Wagon, D.C.Tenn., 139 F.Supp. 674, 678, affirmed 6 Cir., 232 F.2d 892, where the court said:

"The burden is not sustained by pointing to some small incidental interstate activity of a fundamentally intrastate business. Plaintiff must establish that Defendant's employees spend a substantial portion of their time engaging in interstate commerce or regularly engage in the production of goods for interstate commerce."

■ In view of the foregoing decisions the Court is convinced that plaintiff's activities, even if in interstate commerce, were not substantial and did not bring plaintiff under the Act.

It follows from what the Court has heretofore said that plaintiff is entitled to no recovery in the instant case. However, since the plaintiff may wish to appeal the case to the Court of Appeals, this Court is of the opinion that it should consider the remaining contentions of the parties, and thus if the Court of Appeals should determine that plaintiff is covered by the Act, a judgment could be entered for plaintiff without the necessity of remanding the case to this Court for further consideration.

■ Plaintiff alleged in her complaint that the defendants, W. S. Puckett and Twila Puckett, were partners doing business as Proctor Potato Chip Company. There was absolutely no substantial evidence to support this contention, and the Court must hold that Twila Puckett was not a partner and had no ownership in the company. The mere fact that she possibly had an interest in the real property and that she assisted some in the work does not establish a partnership between her and her husband. This is particularly true since no partnership tax returns were ever filed, and Mr. and Mrs. Puckett did not hold themselves out to be partners.

If plaintiff were covered by the Act, she would be entitled to recover for unpaid minimum wages and overtime compensation during the period in question. Plaintiff attempted to keep a record of the hours she worked, and if her record had been absolutely correct she would be entitled to a recovery of $2,336.30. However, there were a number of discrepancies in her records. For one thing, she did not deduct her lunch time which was ordinarily from 10 to 20 minutes per day. On at least three occasions other persons worked for her but her record indicated that she worked on those particular days. There were a number of instances when she would leave the plant for short periods of time without accounting for such absences in her records. The alarm clock which she ordinarily used to determine her starting and finishing time was not dependable, and often did not run. Evidently at times she would forget to check the time when she quit work, because after leaving the plant on various occasions she would ask a fellow worker what time they had quit.

■ In view of the discrepancies in plaintiff's records the Court cannot accept them at face value. On the other hand, most of the discrepancies were relatively minor in nature, and in view of all the circumstances the Court has concluded that plaintiff has established that, if covered by the Act, she would be entitled to at least $2,000 of unpaid minimum wages and overtime compensation. In this connection, in Neal v. Braughton, D.C.W.D.Ark., 111 F.Supp. 775, 779, the court said:

"The burden of proof is upon the employee to establish by a preponderance of the evidence the number of hours of overtime worked each week and the amount of wages due each pay period, and he must produce evidence sufficient to permit a finding without resort to conjecture that he worked a definite number of overtime hours. Mornford v. Andrews, 5 Cir., 151 F.2d 511; Lawley & Son Corporation v. South, 1 Cir.,

140 F.2d 439, certiorari denied 322 U.S. 746, 64 S.Ct. 1156, 88 L.Ed. 1578; Johnson v. Dierks Lumber & Coal Co., 8 Cir., 130 F.2d 115, 118; Rankin v. Jonathan Logan, Inc., D.C.N.J., 98 F.Supp. 1; Marchant v. Sands Taylor & Wood Co., D.C. Mass., 75 F.Supp. 783; Bloch v. Bell, D.C.Ky., 63 F.Supp. 863; Davies v. Onyx Oils & Resins, Inc., D.C.N.J., 63 F.Supp. 777; 169 A.L.R. 1337.

"However, if an employee proves that he has in fact performed work for which he was not compensated as required by law, and introduces sufficient evidence to establish the amount and extent of that work as a matter of just and reasonable inference, then the burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the employee's evidence. If the employer does not produce such evidence, the Court may award damages to the employee even though the result is only an approximation. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515; Handler v. Thrasher, 10 Cir., 191 F.2d 120."

Thus, as above stated, if plaintiff were covered by the Act, she would be entitled to recover $2,000. Plaintiff also contends that she would be entitled to recover liquidated damages, but the Court cannot sustain this contention.

In Neal v. Braughton, supra, the court at page 780 of 111 F.Supp. said:

"If an employer acts in good faith and has reasonable grounds for believing that his actions are in conformity with the Fair Labor Standards Act, the Court in its discretion may refrain from awarding liquidated damages to the complaining employee. 29 U.S.C.A. § 260; F. W. Stock & Sons, Inc., v. Thompson, supra [6 Cir., 194 F.2d 493]; Anderson v. Avery Corporation, D.C. Mich., 84 F.Supp. 55; 21 A.L.R.2d 1384, 1387."

In the instant case it is clear that the defendant, W. S. Puckett, was acting in good faith and upon reasonable grounds. Not only was he advised by his attorneys that his employees were not covered by the Act, but this Court has reached the same conclusion. It is difficult to see, therefore, how the defendant, W. S. Puckett, could be charged with bad faith in his actions. It follows that plaintiff would not be entitled to liquidated damages in any event.

If plaintiff were entitled to a recovery in the instant case, a reasonable attorney's fee would have been $750.

### Conclusions of Law

1.

The Court has jurisdiction of the parties and the subject matter herein.

2.

The plaintiff, Addilee Parks, was not engaged in commerce or in the production of goods for commerce within the meaning of the Fair Labor Standards Act.

3.

Plaintiff was not covered by the Fair Labor Standards Act and is not entitled to recover against the defendants in the instant case.

A judgment in accordance with the above should be entered.