**W. Willard WIRTZ, Secretary of Labor,**
**Plaintiff,**

v.

**NATIONAL ELECTRIC COMPANY, Inc.,**
**and Robert G. Elston, Defendants.**

**Civ. No. 67–63.**

United States District Court
W. D. Oklahoma.

May 20, 1968.

M. J. Parmenter, Regional Atty., Nathan Rachael, Trial Atty., Charles Donahue, Sol., Dept. of Labor, Dallas, Tex., for plaintiff.

Edward E. Soulé, of Lytle, Soulé & Emery, Oklahoma City, Okl., for defendants.

## MEMORANDUM OPINION

DAUGHERTY, District Judge.

Plaintiff brings this action to enjoin Defendants from violating the overtime, record-keeping, and child labor provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. The Complaint did not allege enterprise coverage and the parties stipulated that such coverage was not an issue in the case.

The Defendant Company during the period in question, August 24, 1964 to February 1, 1967, was engaged in the electrical contracting business and in addition sold electrical supplies, mainly lighting fixtures. At the close of trial, the case was left with these issues:

1. Whether the defendant's warehouse employees performed work in interstate commerce by:

   a. unloading extrastate shipments from common carriers, or

   b. handling and storing extrastate goods after they were deposited on the receiving dock of the warehouse by the common carrier involved.

2. Whether work performed by Defendant's employees in rewiring and in-

stalling electrical equipment in a portion of the warehouse of Locke Plumbing Company, which is stipulated to be engaged in interstate commerce, was work performed on a facility of interstate commerce, where the portion of the warehouse rewired was thereafter used as a city sales office and display room.

3. If the Defendant Company is covered by the Act by reason of an affirmative answer to either of the foregoing, whether it may claim exemption as a retail establishment pursuant to 29 U.S.C. § 213(a) (2).

4. Whether the Defendants should be enjoined against future violations of the child labor provisions of the Fair Labor Standards Act, 29 U.S.C. § 212.

### UNLOADING OF INTERSTATE SHIPMENTS BY WAREHOUSE EMPLOYEES

The Plaintiff's evidence consisted of testimony by two warehouse employees to the effect that they occasionally "helped" unload goods from interstate carriers. They acknowledged that they had been specifically instructed by Defendant Elston, their employer, not to assist in the unloading of any merchandise arriving on a common carrier. When pressed to recall a specific instance in which either of them participated in unloading from a common carrier in violation of instructions neither witness could recall any particular occasion. The Court was not favorably impressed with their demeanor on the witness stand under the pressure of cross examination and the Court's own questions.

■ Defendant Elston testified that the instructions referred to above had been in effect continuously since 1963. Considering all the evidence offered on this point, the Court does not find the testimony of the Plaintiff's witnesses to be credible and therefore is insuffi-

cient to establish that the claimed unloading by them actually did occur, and further that evidence is wholly lacking that the claimed unloading was a regular and continuing feature of the witness's employment in the warehouse.

### HANDLING AND STORAGE OF GOODS RECEIVED THROUGH INTERSTATE COMMERCE

There is no dispute that the warehouse employees picked up goods deposited on the warehouse dock by the common carrier involved and carried them to their respective places of storage in the warehouse. The dispute is where interstate commerce ends: at the dock or on the shelves.

■ The point to which interstate commerce of goods continues depends on the ultimate destination intended for them. Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1942). The instant case falls within the third category of commerce mentioned in the Jacksonville case, that of the local merchant, to which the companion case of Jacksonville, Higgins v. Carr Brothers Co., 317 U.S. 572, 63 S.Ct. 337, 87 L.Ed. 468 (1942), applies.

Prior to the Jacksonville and Higgins cases, the precise point here involved had been determined adversely to Plaintiff's contention.[1] In the Veazey Drug Co. case, note 1, the court reasoned:

"There is a definite line of demarcation between intrastate commerce and interstate commerce. If the edge of the dock and the rear end of the truck constituted this line and the driver of the truck and his helpers removed the goods to this line and they were received onto the dock side of the line by the defendant employees, to contend that said employees were acting in interstate commerce is certainly 'pushing' the construction of the statute to an extent not contemplated by the legislative body." 42 F.Supp. at p. 696.

1. Jewel Tea Co. v. Williams, 118 F.2d 202 (Tenth Cir. 1941) ; Jax Beer Co. v. Redfern, 124 F.2d 172 (Fifth Cir. 1941) ; Walling v. Goldblatt Bros., Inc., 128 F.2d

778 (Seventh Cir. 1942) ; Veazey Drug Co. v. Fleming, 42 F.Supp. 689 (D.C.Okl. 1942).

The Jacksonville case, in relation to the question of when interstate commerce ends, devised only the test that it should end when the goods arrived at their intended destination. This test was immediately applied in the Higgins case, with the result "that when the merchandise coming from without the state was unloading at respondent's place of business its 'interstate movement had ended.'" 317 U.S. at p. 574, 63 S.Ct. at p. 338, 87 L.Ed. at p. 471. Cases decided subsequent to these two expressions of the Supreme Court have had no difficulty in terminating interstate commerce at the warehouse dock.[2]

Plaintiff infers that the Supreme Court in the Jacksonville case approved a holding by the Fifth Circuit from which the case was appealed (Fleming v. Jacksonville Paper Co., 128 F.2d 395 (Fifth Cir. 1942)) that warehouse employees handling and storing goods left on the dock by the carrier are in interstate commerce. A reading of the case does not support Plaintiff's position.[3] The opinion does not qualify "delivery" and "property." Thus it is safe to presume that these terms were used in their ordinary sense. Delivery is complete when the goods pass out of the possession of the carrier, and with that transfer of possession, the goods as of that moment (if not before) become the property of the wholesaler, subject to his disposition.

Additionally, Plaintiff cites a number of cases as supporting the proposition that interstate commerce continues on past the unloading dock and into the warehouse bins and shelves, but these cases turned on the fact that either interstate goods were unloaded from the carrier by warehouse employees[4] or on the finding that there was a practical continuity or flow of interstate goods through the warehouse.[5] Obviously, these authorities do not control as nei-

---

2. Walling v. L. Wiemann Co., 52 F.Supp. 131 (D.C.Wis.1943), aff'd 7 Cir., 138 F.2d 602, cert. den. 321 U.S. 785, 64 S.Ct. 782, 88 L.Ed. 1077; Walling v. Bridgeport Tobacco Co., 57 F.Supp. 429 (D.C. Ill.1944); Brosius v. Pepsi-Cola Co., 155 F.2d 99 (Third Cir. 1946); Englert v. S. Birch & Sons Const. Co., 163 F.2d 34 (Ninth Cir. 1947), cert. den. 332 U.S. 816, 68 S.Ct. 154, 92 L.Ed. 392; Maitrejean v. Metcalfe Construction Co., 165 F.2d 571 (Eighth Cir. 1948); Tilbury v. Rogers, 123 F.Supp. 109 (D.C.La.1954), aff'd sub nom. Tilbury v. Mitchell, 5 Cir., 220 F.2d 757, cert. den. 350 U.S. 839, 76 S.Ct. 77, 100 L.Ed. 748; Parks v. Puckett, 154 F.Supp. 842 (D.C.Ark.1957); Mitchell v. Livingston & Thebaut Oil Company, 256 F.2d 757 (Fifth Cir. 1958).

3. Following is the Fifth Circuit Court's reference to this situation: "Without reviewing the multitude of decided cases as to when interstate transportation ends, we are justified in holding that after imported goods are delivered to and received by the importer, and become part of his property held within the State subject to his disposition, whether in the original containers or not, the subsequent sale and delivery of them within the State is intrastate commerce. The typical case is a stock of goods in a warehouse awaiting sales." 128 F.2d at p. 398.

4. James V. Reuter, Inc. v. Walling, 137 F.2d 315 (Fifth Cir. 1943), rev. on other grounds 321 U.S. 671, 64 S.Ct. 826, 88 L.Ed. 1001; McComb v. Herlihy, 161 F.2d 568 (Fourth Cir. 1947); McComb v. Blue Star Auto Stores, 164 F.2d 329 (Seventh Cir. 1947), cert. den. 332 U.S. 855, 68 S.Ct. 387, 92 L.Ed. 424; McComb v. W. E. Wright Co., 168 F.2d 40 (Sixth Cir. 1948), cert. den. 335 U.S. 854, 69 S.Ct. 83, 93 L.Ed. 402; Mitchell v. Royal Baking Co., 219 F.2d 532 (Fifth Cir. 1935); Wirtz v. Durham Sandwich Co., 367 F.2d 810 (Fourth Cir. 1966). The situation in Durkin v. Joyce Agency, 110 F. Supp. 918 (D.C.Ill.1953), reversed sub nom. Mitchell v. Joyce Agency (Seventh Cir.) 211 F.2d 241, vacated 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740 is inapposite, in that it dealt with whether employees of a service agency were covered by the Act because the prime contractor was covered.

5. Walling v. American Stores Co., 133 F.2d 840 (Third Cir. 1943); Walling v. Mutual Wholesale Food & Supply Co., 141 F.2d 331 (Eighth Cir. 1944); Montgomery Ward & Co. v. Antis, 6 Cir., 158 F.2d 948, cert. den. 331 U.S. 811, 67 S.Ct. 1202, 91 L.Ed. 1831; McComb v. Wyandotte Furniture Co., 169 F.2d 766 (Eighth Cir. 1948); Stewart-Jordan Distributing Co. v. Tobin, 210 F.2d 427 (Fifth Cir. 1954).

ther of the mentioned circumstances are here present.

Plaintiff cites only one case which appears to be in conflict with the proposition that interstate commerce ends at the independent wholesaler's dock.[6] Sucrs. de A. Mayol & Co. v. Mitchell, 280 F.2d 477 (First Cir. 1960), cert. den. 364 U.S. 902, 81 S.Ct. 235, 5 L.Ed.2d 195 held that interstate commerce did not end until the goods were sorted and stored within the employer's warehouse. This opinion rests entirely on the First Circuit's view that physical, rather than legal, commingling of the interstate goods with goods in the warehouse is necessary to bring the interstate movement to an end. The Court does not find in the opinions cited by the First Circuit in support of its conclusion a justification for this view.[7] Rather, the Court believes that the First Circuit misapplied the "temporary pause" test used in the second of the enumerated Jacksonville situations, which is the practical continuity doctrine. In the case of a local independent wholesaler, serving in-trastate the general trade, this doctrine has no application.

Apart from the technical consideration previously discussed, the Court is of the opinion that any rule which, in the circumstances of this case, permits extension of interstate movement beyond the warehouse dock and into the warehouse bins and shelves does violence to the Supreme Court's repeated admonitions to adhere to the practicalities of the situation. Assuming, but without deciding, that the rule of de minimis does not apply, it is hardly practical to tell an employer that by receiving any item, however infinitesimal in value, from outside the state, his employees are engaging in interstate commerce, if they have anything whatsoever to do with its storage. The law should not be burdened with such trivialities.

▉▉▉▉ The Court considers a holding that commerce ends at the loading dock to be the most eminently practical one possible: it is clear and it depends upon one fact. It can be understood by any local merchant. There are few

6. Plaintiff also cites Wirtz v. Columbian Mutual Life Ins. Co., 246 F.Supp. 198 (Tenn.1965), aff'd Wirtz v. Durham Sandwich Co., 4 Cir., 367 F.2d 810, and Wirtz v. Standard Container and Paper Company, 389 F.2d 134 (Fifth Cir. 1967), but in the first case, the interstate goods were delivered to a sidewalk freight elevator and taken to the intended recipient by employees of the recipient's landlord. Clearly, delivery of the interstate shipment did not occur until after the employees had handled the goods. In the second case, warehouse employees unloaded interstate shipments and the opinion apparently turned on a practical continuity finding.

7. A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). The First Circuit apparently seized on the Supreme Court's language, 295 U.S. at p. 543, 55 S.Ct. at p. 849, 79 L.Ed. at p. 1587, "The mere fact that there may be a constant flow of commodities into a state does not mean that the flow continues *after the property has arrived and has become commingled with the mass of property within the state* and is there held solely for local disposition and use."

(The italicizing indicates the portion quoted by the First Circuit). It is not clear that the Supreme Court was referring to physical commingling, for it said, "When defendants had made their purchases, whether at the West Washington Market in New York City or at the railroad terminals serving the city, or elsewhere, the poultry was trucked to their slaughterhouses in Brooklyn for local disposition. The interstate transactions in relation to that poultry then ended." 295 U.S. at pp. 542–543, 55 S.Ct. at p. 848, 79 L.Ed. at p. 1587. Indeed, this language would have more easily supported a contrary decision in the Mayol case. In Domenech v. Pan American Standards Brands, Inc., 147 F.2d 994 (First Cir. 1945), not only was the employer a branch distributor of a centralized manufacturing operation, the point involved was whether a local salesman was covered by the Act. Warehouse employees were not involved. In the last case cited by the First Circuit, McComb v. W. E. Wright Co., 168 F.2d 40 (Sixth Cir. 1948), the warehouse employees spent 25% of their time unloading both interstate and intrastate shipments.

times now when there is certainty in the law; these occasions should be encouraged.

## WORK ON LOCKE PLUMBING COMPANY WAREHOUSE

One-third of a Locke Plumbing Company warehouse used to facilitate the interstate movement of goods was converted to a local sales office and display room. Defendant installed wiring and electrical fixtures in the course of this conversion pursuant to contract with the Plumbing Company. The converted portion continues to be used as a local sales office and display room. The remainder of the building is used as a warehouse as before.

At oral arguments, the Court entertained some doubts that the display and local sales office areas of the warehouse should be considered a facility of interstate commerce, and counsel for Plaintiff was unable to explain away the Court's doubts. Plaintiff did acknowledge that a business generally engaged in interstate commerce could have a separate facility or department which is not so utilized and its operation would not be covered by the Act. However, assuming that this portion of the warehouse is a facility of interstate commerce (an assumption not necessarily valid, as the parties offered no evidence on the point), the Court is of the opinion that the work done was not "essential to" nor "directly related" to the production of goods for interstate commerce.

The landmark case is this area is Roland Electric Co v. Walling, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383 (1946). It held that an employee's services which were reasonably necessary to the maintenance of productive machinery used by those engaged in producing for interstate commerce was covered by the Fair Labor Standards Act. By amendment

of 29 U.S.C. § 203(j) in 1949, Congress removed "necessary" and replaced it with "closely related" and "directly essential" to the production of goods for interstate commerce.[8] However, the Roland case was primarily concerned with maintenance-type work, and the new construction problem was approached in Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196 (1955), which held that work on a facility which was to be destined to interstate commerce was included. In Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959), the test is said to be practical, whether the employee's activities are so vitally related to the functioning of the interstate facility as to form a part of it.

The Zachry case, supra, note 8, introduced limitations on the logical path being pursued by the Vollmer and Lublin cases by holding that the construction of a dam is too remote from the channels of interstate commerce to be covered by the Act, while the maintenance of the same dam was not too remote and was covered by the Act.[9] The Supreme Court felt that Congress had restricted, to some degree, the reach of the Act:

"Bearing in mind the cautionary revision in 1949 and that the focal center of coverage is 'commerce,', the combination of the remoteness of this construction from production, and the absence of a dedication of the completed facilities either exclusively or primarily to production, persuades us that the activity is not 'closely related' or 'directly essential' to production for 'commerce.'" 362 U.S. at p. 321, 80 S.Ct. at p. 746, 4 L.Ed.2d at p. 762.

Urged by this logic, the Fourth Circuit held that the wiring and installation of a fire alarm system and air conditioning units in government buildings was

8. Mitchell v. H. B. Zachry Co., 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753 (1960) contains an excellent discussion of the changes wrought by this amendment, 362 U.S. at pp. 314–318, 80 S.Ct. at pp. 742–744, 4 L.Ed.2d at pp. 758–760.

9. This holding sparked a strong dissent because of its inconsistency with the decision in the Vollmer case.

not in commerce, although the government employees using the buildings might be engaged in the production of goods for commerce. Wirtz v. R. E. Lee Electric Company, 339 F.2d 686 (Fourth Cir. 1964). However, in the same case the court held that wiring done at military installations was essential to the functioning of equipment used to maintain and repair aircraft in interstate flights and hence covered by the Act.

Were the display room and city sales office devoted exclusively to the production of goods for interstate commerce, Defendant might be covered as then the wiring would be essential to the electrical equipment common to such offices. However, judging from the stipulated description of the premises, "display area * * * city sales office," an inference of exclusive or primary use in interstate commerce is negatived. It appears that this facility is never used in interstate commerce, but wholly intrastate commerce.

█ Upon consideration of such facts as are available, the Court believes that the logic of the Zachry case applies in that the wiring, when considered with the lack of evidence of exclusive or substantial dedication of the re-wired premises to production of goods for interstate commerce, is not so closely related nor directly essential to such production as may otherwise occur as to justify coverage under the Act. See Mitchell v. S. A. Healy Co., 284 F.2d 39 (Seventh Cir. 1960).

## EXEMPTION AS A RETAIL ESTABLISHMENT

Inasmuch as no coverage has been found under the foregoing circumstances, it is unnecessary for the Court to consider this question.

## INJUNCTION

█ Plaintiff has failed to show that the Defendant is covered by the Fair Labor Standards Act with respect to the warehouse employees and the Locke Plumbing Company job, and only the portion of the case relating to violations of the child labor provisions of the Act are left in the case. Under the circumstances adduced at the trial, the Court does not believe that any useful purpose would be served by the issuance of an injunction against future violations of 29 U.S.C. § 212. The employer acknowledges that it has been covered by the Act since February 1, 1967 and any future violations of the Fair Labor Standards Act should be the subject of a new suit.

Judgment should be entered in favor of the Defendants dismissing the Complaint herein. Counsel for Defendants will prepare the Judgment and present the same to the Court.