**STEWART–JORDAN DISTRIB-UTING CO., Inc.**

**v.**

**TOBIN, Secretary of Labor et al.**
**No. 14458.**

United States Court of Appeals
Fifth Circuit.

Jan. 29, 1954.

O. R. T. Bowden, Theo. Hamilton, Jacksonville, Fla., for appellant.

Sylvia S. Ellison, Atty., Bessie Margolin, Asst. Sol., Stuart Rothman, Sol., William A. Lowe, Herbert Lasky, Attys., U. S. Department of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., U. S. Department of Labor, Birmingham, Ala., for appellee.

Before HUTCHESON, Chief Judge, and HOLMES, and BORAH, Circuit Judges.

BORAH, Circuit Judge.

This suit was brought by the Secretary of Labor to enjoin Stewart-Jordan Distributing Company, Inc., and five of its employees from violating the minimum wage and record keeping provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq. From a decree granting this relief, this appeal was taken by the Stewart-Jordan Company.

The appellant is a wholesale distributor of beer, ale and wine in the City of Jacksonville, Florida. The commodities which it handles and distributes to the

local trade in Florida are all obtained from manufacturers in other states. It receives beer and ale by rail in carload lots and at the rate of approximately 22 carloads per month. These commodities come in three types of containers, i. e., cans, non-returnable bottles and returnable bottles, approximately one-fourth of the total beer and ale handled by appellant being in the latter type of container.

The five individual defendants, who have not appealed, were employed by appellant as truck driver-salesmen. Their duties were to sell and deliver cases of beer and ale and wine to appellant's customers [1] along the respective routes allotted to them to pick up at the customers' establishments and return to appellant's warehouse all empty beer bottles and cases of the re-usable type. The delivery trucks are owned by appellant, who pays all their operation expenses.

Throughout the period in question helpers or "strikers" were also employed on these trucks. In the performance of their duties the helpers sometimes loaded the trucks with the required number of full cases of beer and ale. At other times the loading was done by warehouse employees. The helpers do not confine their efforts solely to the trucks on which they are respectively employed but at times assist in the loading and unloading of other trucks. The helpers ride with the driver over his route, unload at each customer's place of business the required number of cases of beer and ale and also pick up and load onto the truck the empty returnable bottles which have accumulated there. Before picking up the empties they first carefully check each case which is marked with the name of the out-state brewery to ascertain that it is full and contains only bottles of the type which were returnable to the particular breweries. Upon returning to the warehouse the helpers unload these cases of empty bottles from the trucks and stack them against the warehouse wall at a place designated by the warehouse foreman, who supervises the loading and unloading of trucks. The helpers and truck drivers pick up and return to the warehouse approximately 2,000 cases of empty bottles each week. Subsequently all of these returnable bottles are moved to the back of the warehouse by warehouse employees where they are again inspected for broken or unsuitable bottles. Approximately once a week a railroad car is loaded with about 2,000 cases of these empties and shipped back to the out-state brewery.

During the period here involved the truck driver-salesmen were employees of appellant and at all times such drivers were permitted to hire and fire their own helpers for work on the trucks, exercise control over their hours of work and supervise their activities, which were for the benefit of the company. Prior to the week ending October 7, 1950, the company considered the helpers to be its employees and paid them their wages of $5 per day directly and kept records of such employment. After that week the appellant discontinued keeping payroll records on the helpers and thereafter they received their wages from the drivers rather than in a separate envelope prepared by appellant. This change over was made under these rather significant circumstances.

During September of 1950, an investigator of the Wage and Hour Division made an investigation of appellant's operations. At the conclusion of that investigation he informed appellant's vice-president and general manager that the helpers were being employed on an average workday of ten hours and were being paid a daily wage of $5 which was less than the 75 cents an hour minimum wage required by the Act. The appellant thereupon paid the helpers the back wages due them but thereafter and at the conclusion of the work week ending October 7, 1950, the company dropped the helpers from its payrolls and at the same

time increased the truck drivers' salaries from $30 to $32 per week plus a "bonus" of $5 per day when their daily sales of beer and ale exceeded 135 cases. The evidence shows that this daily quota was exceeded practically every day. The only exception was on one route on which the driver did not have a helper. In addition to their base salary the appellant had prior to October 7, 1950, paid its truck drivers a commission of 6 cents for each case of beer and ale sold plus an annual commission of one-half cent per case on beer and ale and a four percent commission on sales of wine. After that date it continued to pay these commissions in addition to the new "bonus" of $5 per day. Apart from the change in payroll procedure there was no change in relations between the drivers, the company and the helpers. After October 7, 1950, the same helpers continued to work on the trucks for the same number of hours each day performing the same duties and for the same pay of $5 per day until the new bonus for the drivers was raised to $6 per day at which time the pay of most of the helpers also arose to $6 per day. After October 7, 1950, as before, the helpers reported for work at the company warehouse at 7:30 A.M., worked an average minimum of ten hours each work day, and were paid first five and then six dollars per day or in any event less than the statutory 75 cents an hour minimum wage.

On the basis of this evidence the district judge found: (1) that at all times subsequent to January 25, 1950, appellant continued to be the employer of the drivers' helpers and that its drivers were employees within the meaning of the Act in that they acted in the interest of appellant in relation to appellant's employees; (2) that the drivers' helpers are engaged in a stream of commerce which begins at the establishment where the empty containers are picked up and continues throughout the journey to the warehouse, through the warehouse to the railroad car and to the ultimate destination of such containers at the out-state brewery.

The appellant relying on cases such as Clougherty v. James Vernor Co., 6 Cir., 187 F.2d 288, and Walling v. Sanders, 6 Cir., 136 F.2d 78, is here contending that the "production of goods for commerce" phase of coverage should be interpreted so as not to include the handling of goods for the mere purpose of furthering their interstate transit. On the basis of this premise it is argued that the drivers' helpers who were picking up empty bottles were not engaged in the "production of goods for commerce" but were at most merely handling for transit purposes and marshaling the bottles on a local basis and returning them to the warehouse, all of which is a purely local operation preparatory to being put in the stream of commerce and, therefore, without the provisions of the Act.

There is no contention on the part of the administrator that these drivers and helpers are engaged in the production of goods for commerce. This phase of the Act's coverage is not in issue and the cases upon which appellant relies are beside the point. In Clougherty v. James Vernor Co., supra [187 F.2d 292], one of the questions presented was whether employees who perform a local delivery and pickup at retail outlets, returning the empty ginger ale bottles to the local plant for a use which is partially interstate, are engaged in an occupation necessary to the production of goods, that is, ginger ale. In answering this question in the negative the court observed that the controlling test as to the drivers is not how the bottle is used in the plant, but how the drivers handle it. And considering the character of their activities the court said: "Their handling of the bottles not only precedes the process of producing the ginger ale but is no part of the production. The city drivers do not even unload the bottles at the plant, and neither they nor the helpers nor the highway drivers cooperate in the washing, the blending of the ingredients, the twirling, or any other part of the process which ties in with the production of the ginger ale." Thus it is plain that the court did not even con-

sider the coverage issue which this case presents. Nor was there any occasion for it to do so for the administrator did not there contend that the empty bottles were in interstate commerce when being returned to the plant. As to Walling v. Sanders, supra [136 F.2d 81], it is not easy to understand how this case can be regarded as having any applicability to the question we are presently considering since the court specifically stated that it was not deciding the question The court pointed this out clearly when it said: "Whether a different conclusion would be necessary in respect to the local drivers [2] of beer delivery trucks by reason of their pick up of empty cases and bottles destined ultimately for return to the out-state breweries, if such drivers were in the employ of the defendant, *we have no need to decide* because upon careful consideration of all of the facts and circumstances, we are not persuaded that the drivers are in the employ of the appellee rather than of its salesmen." (Emphasis supplied.)

The District Court found that the drivers and helpers who load empty cases and bottles into trucks which were intended for interstate shipment and return to the breweries pursuant to an agreement with them that they will buy back all the empty bottles sent back, are engaged in Commerce within the meaning of the Act. We agree with this holding and think the decision in Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 335, 87 L.Ed. 460, is controlling. In that case the question presented was whether the Act applied to employees of a wholesale distributor who were engaged in the delivery, from company warehouse in Florida to customers in the same state, of goods procured outside of the state pursuant to contracts or understandings with such customers. In answering this question the Supreme Court laid down certain described tests. With respect to the goods which were procured outside the state and brought

to the warehouse pursuant to a preexisting contract or understanding that their intended destination was the customer's place of business, the Supreme Court held that such goods retain their character as goods, in interstate commerce until finally delivered to the customer and they are not divested of that character by the temporary pause at the warehouse. In this connection the court laid down this test: "if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach these points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce."

The record reveals that at the time appellant purchases the beer from the out-state breweries it has a set agreement with them that they will buy back at a stipulated price all the empty cases and bottles which appellant cares to return to them. And pursuant to their agreement and understanding appellant gathers the empty cases and bottles "for the purpose of sending them back." Thus from the moment they are picked up by appellant's drivers and helpers their intended destination is beyond the warehouse to a specific out-state brewery.

The fact that all of appellant's business is not shown to have an interstate character is not important. Nor is it important that some of the helpers' activities relate to other aspects of appellant's business which is shown to have an intrastate character. For, as was pointed out in the Jacksonville Paper Company case: "The applicability of the Act is dependent on the character of the employees' work. Kirschbaum Co. v. Walling, supra, 316 U.S. [517], page 524,

2. In this case the duties of the drivers and salesmen correspond respectively to the duties of the helpers and driver-salesmen in the instant case.

62 S.Ct. [1116], 1120, 86 L.Ed. 1638. If a substantial part of an employee's activities related to goods whose movement in the channels of interstate commerce was established by the test we have described, he is covered by the Act." Here the helpers spend a substantial part of their time in picking up, loading on delivery trucks, transporting to the warehouse, and unloading and stacking there cases of empty bottles which are intended for and which are shipped to out-state breweries and the district court rightly held that they were engaged in interstate commerce.

■ Finally, appellant claims that the helpers who are hired, fired and paid from personal funds of the drivers were not the employees of the company but employees of the drivers only. In advancing this contention appellant willingly concedes that the drivers were and are its employees and as to the helpers it does not deny that it likewise regarded them as its employees prior to the week ending October 7, 1950. But after that week appellant claims that it completely severed its relationship with the helpers all of which is evidenced by the fact that the company then dropped the helpers from its payrolls and thereafter they received their pay from their driver-employers. The district judge thought that the change over was a mere subterfuge and represented nothing more than a calculated attempt on the part of the employer to escape responsibility under the Act. He also was of the fixed opinion that the new arrangement had not effected any substantial change in the employment relationship and that after the change over as before the helpers' work was performed for the benefit of the company. In thus rejecting appellant's contention we think the district judge was on firm ground and fully supported by the authorities. Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772; see also Tobin v. Anthony-Williams Mfg. Co., 8 Cir., 196 F. 2d 547; McComb v. Homeworkers' Handicraft Cooperative, 4 Cir., 176 F. 2d 633; Fahs v. Tree-Gold Co-op Growers of Florida, 5 Cir., 166 F.2d 40; Western Union Tel. Co. v. McComb, 6 Cir., 165 F.2d 65. For, as was pointed out in Rutherford Food Corp. v. McComb, supra [331 U.S. 722, 67 S.Ct. 1477], the determination of the employment relationship does not depend upon any "isolated factors" or any "label" used to describe the relationship but rather "upon the circumstances of the whole activity." So it matters not how the facts are weighed, they will not support a conclusion that the helpers were not, as an economic fact, working for and dependent upon appellant's business as their means of livelihood.

Upon the whole we conclude as did the trial judge, that the helpers were employees of Stewart-Jordan Distributing Company under the Fair Labor Standards Act.

The decree below is affirmed.

HUTCHESON, Chief Judge (dissenting).

I agree with the holding of the majority on the question most labored in the case, that the helpers involved are employees of the respondent, and if I could agree that the containers handled by them were in commerce when handled by them, I could agree that the decree must be affirmed.

I agree, too, with the majority that, upon the question whether the empty containers when handled by the helpers were in commerce, the decision in Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460, is controlling here. Since, however, "the bearings of that observation lies in the application of it", I hasten to add that the application to the facts of this case of the principles declared and applied there require not the affirmance but the reversal of the decree.

It is true that the opinion at page 567 of 317 U.S. at page 335 of 63 S.Ct. declares (a declaration with which I fully agree): "It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate com-

merce. There is no indication (apart from the exemptions contained in § 13) that once the goods entered the channels of interstate commerce, Congress stopped short of control over the entire movement of them until their interstate journey was ended. No ritual of placing goods in a warehouse can be allowed to defeat that purpose. The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the act."

But it is also true that, after agreeing with the administrator as to certain of the categories dealt with in that case, that the goods received "in commerce" at the warehouse remained "in commerce" and their interstate journey ended only when delivered to retail customers, the court went on to say:

"As to the balance, we do not think the Administrator has sustained the burden which is on a petitioner of establishing error in a judgment which we are asked to set aside. We do not mean to imply that a wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts, might not at times be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce' within the meaning of the Act. It was said in

Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518, that 'commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business.' While that observation was made apropos of the constitutional scope of the commerce power, it is equally apt as a starting point for inquiry whether a particular business is 'in commerce' within the meaning of this Act. We do not believe, however, that on this phase of the case such a course of business is revealed by this record. The evidence said to support it is of a wholly general character and lacks that particularity necessary to show that the goods in question were different from goods acquired and held by a local merchant for local disposition.

"In this connection we cannot be unmindful that Congress in enacting this statute plainly indicated its purpose to leave local business to the protection of the states. S.Rep. No. 884, 75th Cong., 1st Sess., p. 5; 83 Cong.Rec., 75th Cong., 3d Sess., Pt. 8, p. 9169. Moreover as we stated in Kirschbaum Co. v. Walling, supra, 316 U.S. [517, pages] 522–523, 62 S.Ct. [1116], 1119, 1120, 86 L.Ed. 1638, Congress did not exercise in this Act the full scope of the commerce power."

Applying these principles to this case, the facts of which are agreed, or testified, to without dispute, as set out below,[3]

---

**3.** Mr. Maxfield testified:

"Q. What is the business of Stewart-Jordan Distributing Co., Mr. Maxfield? A. They are engaged in the business of distribution of beer and wine.

"Q. What brands of beer do you distribute? A. Pabst Blue Ribbon and Berger Beer and Ale.

"Q. Where is this beer and ale obtained? A. Pabst Blue Ribbon comes from Peoria, Illinois; Berger Beer comes from Cincinnati, Ohio.

"Q. What type containers does that beer and ale come to you in, Mr. Maxfield? A. It comes to us in twenty-four, twelve ounce bottles, per case. Twelve,

thirty-two ounce bottles; cans; and, in draft beer, half barrel containers.

"Q. Of the bottled beer, is some of it contained in what is called 'non-returnable bottles' and some in 'returnable bottles'? A. The greater part of it is in non-returnable bottles.

"Q. But, you do receive some in returnable bottles? A. We do receive some, yes.

"Q. Of these returnable bottles received from the brewery, are you required to place a deposit on those bottles when they are shipped to you? A. We buy those bottles when they are shipped to us.

it seems perfectly clear to me that it is to completely misapprehend either the effect of the undisputed facts or of the meaning and effect of the opinion in the Jacksonville case or of both to hold, as the majority does, that because the appel-

"Q. You buy them outright? A. Yes, sir.

"The Court: You buy them and sell them back at an exchange price, when you return them? A. Yes, sir, that's right.

"Mr. Kirvin: Now we have agreed, Mr. Maxfield, that you shipped a carload of empty containers back to the brewery approximately once a week. Where do you get the containers that you ship back? A. We pick those empty containers up out among the retail trade.

"Q. Do your regular delivery trucks pick them up when they go out to make deliveries, then, to the customers? A. That's right.

"Q. Does your company employ driver-salesmen, Mr. Maxfield? A. Yes, sir.

"Q. What duties do these driver-salesmen perform? A. Their duties are the sales and—of beer and ale from the truck route. From a truck. Over a stipulated certain route, each day of the week.

"Q. Do they also—*is it also part of their duties to return these empty containers to your warehouse, too?* A. That's right.

"Q. Is each driver assigned a specific route? A. More or less, yes, sir. Each driver is assigned a particular territory or route, to serve them.

"Q. Do they have customers on the route, on whom they are supposed to call at certain intervals? A. That's right.

\* \* \* \* \* \* \*

"Q. You ship around four a month. Three to four each month, out, and you get in an average of twenty-two and as high as thirty-six cars. What is the occasion of the difference in those two figures? A. The occasion for the difference in those two figures is because of the non-returnable bottles and cans.

"Q. At the time you purchase that beer and that beer is sent to you, are you charged for the bottles at that time? A. We buy the bottles, yes.

"Q. Then, they are the property of Stewart-Jordan? A. They are our property.

"Q. Are you obliged or do you have any understanding with the factory that you will return bottles? A. Not a compulsory agreement with the factory. We have a set agreement with them that they will buy back all the empties we care to send back to them, but there is nothing compels us to send them back to them.

"The Court: You do gather them for the purpose of sending them back, however? A. Yes, sir.

\* \* \* \* \* \* \*

"Q. *What processes, if any, do the empties go through at the time they are returned to your plant, Mr. Maxfield? A. These empties are brought in by the driver-salesmen, on the trucks, and placed in the front section of the warehouse, in a separate section, where they are checked by the office for accuracy as to the number of cases returned. Then they are checked by our warehouse crew for accuracy of the contents, whether they are the right kind of bottles and right kind of cases, and then they are placed on floats and sent back to our warehouse stack, or stock, as we call it, because we keep accurate inventory on those empties, and where they are, and they are eventually placed in the car and shipped to the factory.*" (Emphasis supplied.)

"Q. Each case of bottles, then, is then individually checked after it gets off the truck, before it is placed into the stock? A. Yes, sir.

Joe Thompson testified:

"Q. What is the first thing you do when you go to work in the morning? A. The first thing is to locate the driver and find the truck.

"Q. Then what do you do? A. We load the truck.

"Q. What do you load on the truck? A. Beer.

"Q. How do you know how much beer to put on the trucks? A. Well, we have a list of how many cases he desire.

"Q. The driver tells you how many cases? A. Yes, sir.

"Q. What do you do when you get in at night? A. Well, if it is not too late, we take empties off and straighten up the truck and get it checked.

"Q. When you take the empties off, where do you put them? A. Put them against the wall.

"Q. Do you pick up empties all during the day when you are working on the route? A. Yes, sir.

"Q. When you pick them up, do you check the cases that you pick up? A. Yes, sir.

"Q. What do you check them for? A. The bottles. See if they have the right bottles in them.

"Q. What are the right bottles? A. Brown bottles.

lant's employees involved in this case, in the course of their purely intrastate solicitation, sale and delivery of beer, pick up some of the empties for return to the warehouse and because the warehouse, after assorting and assembling enough of them to make a carload, ships them in interstate commerce, these employees are engaged in commerce.

In the first place, this holding, that the picking up of a small part of the empties for return to the warehouse brings these men, whose activities are essentially intrastate, into interstate

"Q. If you have something other than brown bottles, what do you do? A. Take them out and ask for brown bottles.

"Q. How do you know what cases to pick up? A. We pick up Pabst Blue Ribbon cases.

"Q. Do you ever pick up any Berger cases? A. Seldom. We handle Berger Beer, but seldom pick up Berger cases. Not since I been on the truck.

\* \* \* \* \* \* \*

"A. We have Berger Beer and we have ale and we have wine.

"Q. Now, do you get empties from all those other things? You said you got empties from Berger Beer? A. I never handled any Berger stuff. I just handled Blue Ribbon.

"Q. Do you get any empties back of that beer? A. We seldom get any empties on Berger Beer.

"Q. Do you get any empties back on wine? A. No, sir.

"Q. Is all the beer that you take out, Pabst Blue Ribbon? Do you take cans with you? A. Yes, sir.

"Q. Do you take no-return bottles with you? A. Yes, sir.

"Q. After you have been on your route and got rid of your beer, how many cases would you have on your truck, of empties? A. That's according to the sales.

"Q. That's right. Well, I will ask you this. Do you have any idea, generally, of empties, how many you would have? A. Twenty-five to thirty.

Walter Morrison testified:

"Q. Where do you work, Walter? A. Stewart-Jordan, Pabst Blue Ribbon.

"Q. How long have you been working there? A. I work for the company about a year now.

"Q. What job—what kind of work do you do there? A. *Well, we—sometimes we unload trucks and put them up there against the wall, for the warehouse, and then we check them and load them on a float and send them to the back of the warehouse, until we get a stack of enough to load a car, and a car comes in and we load them in the car.*

"Q. *And when you move these cases of these empty bottles, you move them from the front of the warehouse to the back?* A. *Yes, sir.*

"Q. When you move them, you say you check them? What do you do that for? A. To see they have the right bottles in them.

"Q. What are the right bottles. A. All brown bottles.

"Q. If you have all brown bottles in them, what do you do? A. Put them in different places, and when we get enough of them, we load them up.

"Q. *If you don't have all brown bottles, what do you do? A. We have to set them aside until we have enough to make them up—make the cases up.* Some of them have Coca-Cola bottles, and we take them out.

\* \* \* \* \*

"Q. I see. Now, when the empties come in at night—when they come in at night with their empties, what happens when the truck comes in with the empties? Do they unload them? A. We help unload them. Help unload the truck.

"Q. *Does the warehouse gang have to check the bottles and cases after they get in there? A. Yes, sir.*

"Q. *And you do, I believe, sort them and fill up crates, and take green ones out and put them in other boxes? A. Yes, sir.*

"Q. *After they have been sorted like that you stack them, is that right? A. Yes, sir.*

"Q. *And then you ship them out?* (Emphasis supplied) A. That's right."

Aaron Hines testified:

"Q. What kind of work do you do? A. Warehouse man.

"Q. What do you do in the warehouse? A. Load trucks; unload them. Cars.

"Q. Do you handle containers full of empty bottles in the warehouse? A. Yes, sir.

"Q. What do you do to those bottles? A. Check them.

"Q. What do you check them for? A. For outlaw bottles, to see if they full, and, the kind of bottles. Certain kind of bottles.

"Q. Then, do you load them on railroad cars? A. Yes, sir, after they are checked."

commerce, makes the tail (and a very little tail at that attached to a very large dog) wag the dog.

But, in the second place, and far more important, it is a distortion of all the decisions, from Coe v. Town of Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715, down, to say, under this evidence, that, *with the picking up of the empty bottles which, while still loaded, had become a part of the mass of property in the state, and their delivery to the warehouse, their movement in interstate commerce has begun.*

If it had already begun, so that the cans were already in the stream of commerce, I should, of course, agree that the temporary unloading and depositing of the cans at the warehouse did not divert them from that stream. It seems clear to me, though, that it is a great abuse of the metaphor to call the dry run evidenced here in the completely intrastate delivery of the mass of full bottles, returnable and non-returnable, to the retail trade, and the as completely intrastate sorting, selecting, picking up, and returning to the warehouse, a part of the stream of, indeed even a trickle in, interstate commerce.

As correctly pointed out in appellant's brief, the question of when the interstate journey commences, while of a similar nature, is not the precise question and does not present precisely the same problem in determining it, which was presented in the Jacksonville case, whether an interstate journey, after it had once commenced, was merely temporarily interrupted or had ended. In Coe v. Town of Errol, supra [116 U.S. 517, 6 S.Ct. 477], the court, stated:

"This question does not present the predicament of goods in course of transportation through a state, though detained for a time within the state by low water or other causes of delay, as was the case of the logs cut in the state of Maine, the tax on which was evaded by the supreme court of New Hampshire.

Such goods are already in the course of commercial transportation, and are clearly under the protection of the constitution."

In all the cases decided since which deal with the question when does the interstate journey commence, the courts have held without wavering that the interstate journey of goods does not commence until they have started upon such transportation in a continuous route or journey to another state or have been committed to a common carrier for transportation to another state. The transportation of goods to a depot or other place from which the journey to another state is to begin is not part of the journey, but is only preliminary and is performed for the purpose of putting the property in a state of preparation and readiness for transportation. The intention to ship the goods outside the state and partial preparation to do so are of no consequence. In Coe v. Town of Errol, supra, the court said:

"Although intended for exportation, they may never be exported, —the owner has a perfect right to change his mind,—and until actually put in motion for some place outside of the state, or committed to the custody of a carrier for transportation to such place, why may they not be regarded as still remaining a part of the general mass •of property in the state?"

In the same case the Court stated:

"The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence, is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation."

On the principles laid down in Coe v. Town of Errol, and on the authority of the Jacksonville case and the cases it cites, which recognize and enforce those principles, I respectfully dissent.