Eleanor BONNETTE, Faye Pryor, Vickie Young, Joanne R. Cardone, Marjorie Marshall, Thet Poy Chung, Elizabeth Tears and Amelia Walker, Plaintiffs,

v.

CALIFORNIA HEALTH AND WELFARE AGENCY and Mario Obledo, individually and in his capacity as Secretary of the California Health and Welfare Agency; California Department of Health and Beverlee Myers, individually and in her capacity as Director of the California Department of Health; California Department of Social Services and Marion Woods, individually and in his capacity as Director of the California Department of Social Services; Solano County Public Welfare Department and Crawford Tucker, individually and in his capacity as Acting Director of the Solano County Public Welfare Department; San Francisco County Department of Social Services and Edwin Sarsfield, individually and in his capacity as Director of the San Francisco County Department of Social Services; Sacramento County Department of Social Welfare and William Redmond, individually and in his capacity as Director of the Sacramento County Department of Social Welfare, Defendants.

No. C–75–1812–MHP.

United States District Court, N. D. California.

Sept. 24, 1981.

As Amended Nov. 24, 1981.

See also D.C. 414 F.Supp. 212.

Nancy Levin, R. Anthony Finkas, Solano Co. Legal Asst. Agcy., Vallejo, Cal., Rebecca I. McKee, Employment Law Center, San

Francisco, Cal., Craig H. Scott, Pittsburg, Cal., Public Advocates, San Francisco, Cal., for plaintiffs.

Winifred Smith, Deputy Atty. Gen., San Francisco, Cal., Thomas H. Gordinier, Fairfield, Cal., Gretchen Nicholson, Deputy City Atty., San Francisco, Cal., John Heinrich, County Counsel, Sacramento, Cal., Joseph Taillefer, Deputy Co. Counsel, County of Sacramento, Sacramento, Cal., Patrick Bupara, Asst. U. S. Atty., San Francisco, Cal., for defendants.

## OPINION AND ORDER AMENDED

PATEL, District Judge.

This matter was tried and submitted to the court upon the brief testimony of witnesses, exhibits and designated depositions. The parties have stipulated to certain preliminary facts and those facts are adopted herein as the findings of fact of this court.

Plaintiffs Eleanor Bonnette, Faye Pryor, Vickie Young, Joanne R. Cardone, Thet Poy Chung,[1] Elizabeth Tears, Marjorie Marshall and Amelia Walker are domestic workers who provided in-home supportive services to public assistance recipients during all or part of the period from May 1974 to October 1976.

The defendants in this action are: California Health and Welfare Agency and its Secretary, Mario Obledo; California Department of Health Services and its Director, Beverlee Myers; California Department of Social Services and its Director, Marion Woods; Solano County Public Welfare Department and its Acting Director, Crawford Tucker; San Francisco County Department of Social Services and its Director, Edwin Sarsfield; and Sacramento County Department of Social Welfare and its Director, William Redmond.

This action is brought under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* Plaintiffs claim that the state and county defendants, acting jointly with the public assistance recipients who receive the services, employ plaintiffs and have violated the minimum wage provisions of the FLSA.

## STIPULATED FACTS

Since the early 1950's, the State of California has elected to participate with the federal government in addressing the special needs of the aged, the blind, and disabled welfare recipients. The federal grant program for the disabled, blind, and aged was administered by the State Department of Health and the counties. The state had an option of providing an additional grant to these recipients to meet their special needs. The state legislature exercised that option, establishing an Attendant Care program which permitted these particular welfare recipients to contract with individual providers to perform various domestic services. The federal government provided 50% of the funding for such services; the state and counties jointly funded the remaining 50%.[2]

Amendments to the Social Security Act, H.R. 1, 93d Cong., 1st Sess. (1973), which became effective January 1, 1974, replaced the public assistance program with federally administered Supplemental Security Income—State Supplemental Payment Programs [hereinafter SSI—SSP]. This program provided for cash grant living allowances to aged, blind, and disabled recipients. It did not provide for supplemental payments to recipients for the purchase of attendant care services nor did it provide for the payment of salaries of county-employed homemakers.

Consequently, the termination of the public assistance program (Old Age Assistance,

1. The oral motion for nonsuit with regard to this plaintiff by defendant County of San Francisco is hereby DENIED.

2. In July 1970, the California Department of Social Welfare supplemented the Attendant Care program with a statewide experimental Homemaker Service program utilizing 75%

federal Social Services Funds (Social Security Act). Under this program, a county could employ a homemaker directly to provide services to the aged, blind, or disabled recipient or could contract with an agency or individual to provide such services.

Aid to the Blind, and Aid to the Totally Disabled) meant the end of the funding mechanism for the Attendant Care program as of January 1, 1974. A new program, In-Home Supportive Services (IHSS), which would utilize another source of federal Social Services Funds, was devised. The In-Home Supportive Services program is provided for in California Welfare and Institutions Code § 12300 et seq., which went into effect January 1, 1974. As with the experimental Homemaker Service program, the federal government was to provide 75% of the funding for the new program and the state was to provide the remaining 25%. The counties were relieved of any financial responsibility although they continued to administer the program. The statutory purpose of this consolidated program continued to be to enable aged, blind, and disabled adults to remain in their own homes by supplying homemaker/chore services. The old Attendant Care program was replaced by the Chore Service program.

The state legislature set the eligibility requirements and established three methods by which counties could deliver in-home care to public assistance recipients. Cal. Welf. & Inst. Code § 12302. A county could hire in-home service workers directly via its civil service system; chore persons hired in this manner would clearly be employees of the county. These workers would be entitled to all the rights, benefits, and protections which civil service entails.

The second method of providing in-home supportive services was for a county to contract with agencies or individuals engaged to perform such services.

The third method of providing in-home supportive services was for a county to "make direct payment to recipients" for the purchase of services. This was the method of delivery of services utilized in the employment of all plaintiffs in this lawsuit.

In 1976, the State Department of Industrial Relations issued a state minimum wage order covering domestic workers such as plaintiffs. The Department of Health instructed county welfare departments that the wage order applied to providers of in-home supported services. As of October 1, 1976, chore workers throughout the state were entitled to receive the state minimum wage, which has always at least equaled the federal minimum.

All counties wishing to participate in the program were required to submit to the state plans for its implementation in their jurisdictions. Included in these plans were the method(s) by which a particular county proposed to deliver in-home supportive services.

The Sacramento County Department of Social Welfare, the Solano County Public Welfare Department, and the San Francisco Department of Social Services are responsible in their respective counties for the administration of the In-Home Supportive Services program. During the period of time relevant to this action, May 1974 to October 1976, the State of California disbursed funds to defendant counties for the purpose of administering the In-Home Supportive Services program. Defendant counties disbursed federal and state monies specified above to certain welfare recipients for the purpose of securing chore services for their benefit.

## FINDINGS OF THE COURT

The direct payment method of providing in-home support services to the aged, blind and disabled and the use of chore workers paid in this manner were in furtherance of the goals and objectives of the California Health and Welfare Agency and the various county social services departments before this court. The direct payment method was less costly to the counties and the state. There was a fiscal benefit to the taxpayer. There was a substantial benefit to the welfare recipients. Without these programs, the recipients would be institutionalized. If in-home services were limited to the county employee method or the use of contract agencies the expense to the state and the counties would be greater.

The California State Department of Health issued guidelines and instructions to the counties for administration of chore ser-

vice programs. The guidelines covered eligibility, service needs assessment, selection and training of providers, methods of payment to chore service workers and the establishment of rates of pay. Each county was required to annually submit its plan for in-home supportive services to the state. The plans were regularly reviewed by the state. Because the programs were fully funded by the state and federal governments, the county drew against the state funds in accordance with the approved plan.

The counties were free to set the rates of pay for chore providers within the limits established by the state. The state would not approve any plan if its wage rate was out of line. The proposed rates set forth in the plan were to be supported by relevant data. There was no specific state provision on the hourly rate of pay until the 1976 order.

The state has admitted it had no substantial concern whether payment of the minimum wage to chore workers would increase costs because other home care providers were already paid wages clustered around the minimum wage figure. The counties generally had a greater concern for the fiscal effects of paying the minimum wage.

The counties deliberately attempted to structure the chore service program in such a way that the recipient would be considered the employer of the chore worker. They used considerable care to avoid being considered the employer of the chore workers. On the other hand, the state considered the securing of chore worker services a joint arrangement between the state and the recipient.

The state not only approved the county plans but also reviewed their implementation and, on a few occasions, conducted field visits to determine if the work contracted for was being performed.

Prior to the 1976 state order, some chore providers were paid at a rate of pay equal to the federal minimum wage. However, some providers were precluded from receiving the minimum wage by flat maximum grants to recipients. Where the provider worked a number of hours greater than the grant could cover at the minimum wage, the provider received a wage lower than the minimum rate. Each of the plaintiffs worked for some period of time at a rate below the minimum wage in effect at that time. The counties and the state were aware that this result could and did occur. The state position on the allocation of funds, e. g., grant maximums, was a contributing factor to some chore workers receiving less than minimum wage.

The procedures for obtaining chore workers was substantially the same in the three counties before the court. The need of a recipient for home care services was generally brought to the attention of a county social service worker by the recipient, a friend or relative of the recipient, a Social Security employee, a hospital, doctor or other informed party. A social service worker (or social worker) assigned to the case would determine financial eligibility, obtain a medical certificate of need and perform an in-home needs assessment. The in-home evaluation involved assessing the tasks required by the recipient such as housecleaning, bathing, personal care, cooking, shopping and other household chores. The social service worker, using a standard county form, determined the tasks needed by the recipient and the hours per week required to perform the tasks. This decision was based upon information obtained from the recipient, the recipient's friends, relatives or doctor and any other pertinent information available to the social service worker. The County of San Francisco had written guidelines for the allocation of time for certain jobs.

If there was a disagreement between a recipient and the worker as to the tasks needed or the amount of time required, the worker attempted to resolve it with the recipient. However, if no resolution could be reached the worker made the final decision subject to approval of his or her supervisor. There were instances when requested services were denied. Any dispute with the county's determination, initial assessment or subsequent reassessment was reviewable by the State Fair Hearing Board.

At the review hearing a presumption operated in favor of the social services worker's determination and the burden was upon the recipient to show need for greater or different services.

Social service workers were specifically instructed not to engage in the hiring, supervising or firing of chore workers. They were instructed by their departments that the recipients were the employers and were to have the responsibility for these duties.

At the initial evaluation, the recipient was informed that he or she was considered the employer of the chore worker and had the right to hire and fire the chore worker. The recipient was encouraged to select a worker from among persons known to him or her such as a relative, neighbor or friend. Relatives were sometimes consulted for suggested names. If the recipient had no one in mind, the social service worker would provide a list of potential chore workers. This list was in some cases maintained by the county, in others by the social service worker and in some cases by both. Maintaining lists was not a regularized function of the county social services offices. In some instances they were kept current; in others they were not. They included persons who had served as chore workers in the past, persons who requested to be put on the list and some persons who were receiving public assistance.

Social service workers followed different practices upon learning that a particular chore worker was not a good employee. Some workers would strike the provider from the list, others would pass on the information as a caveat to the recipient and still others would tend to forget the name.

Social workers making referrals from the list might give the recipient one name or several names. They generally provided little information about the chore worker to the recipient. However, there were workers who did not merely take names from the list, but considered such things as the proximity of the chore worker to the recipient's home or the availability of transportation for the chore worker.

The recipient was asked to contact and hire the chore worker. If the recipient was physically or for other reasons unable to do this, a relative or friend was asked to make the arrangements. In some instances when the recipient was incapacitated and there was no one to assist, the social worker would contact the chore worker and arrange for the providing of services.

The hourly rate of pay for chore worker services was established by the county. The recipient was not permitted to pay a higher rate than allowed by the county schedule. Occasionally, recipients were told that their preferred rate of pay was too high and that it had to be reduced. A recipient who failed to comply might find his or her grant (or allowance) cut off.

Verification of the hours worked was required before payment was authorized and made by the county. In the County of San Francisco, the recipient submitted a time sheet showing the number of hours the provider worked. In Solano County, a verification form signed by the recipient and the chore worker was required and the money was paid to the chore worker only upon receipt of the signed form.

When the recipient received the funds directly and bore the responsibility of paying the chore worker but failed to pay over the money, the social services worker would intervene. There were several alternative solutions available depending on the gravity of the situation. The social worker might counsel the recipient or put him or her on a money management program. The social worker might arrange for a substitute payee to receive and pay out the money. The most drastic remedy was to initiate an investigation which could result in a cutoff of the recipient's funds.

When the chore provider worked in excess of the number of hours approved, the county would not authorize payment for the excess hours. The method of payment varied in each county and in certain counties the recipient was not involved in the actual handling of moneys. For a time, San Francisco had a system of payment by two-party check payable to the recipient and the chore

provider. For another period of time the check was made payable directly to the chore provider. The county also had a substitute payee program for recipients incapable of handling finances.

In Sacramento County the check for payment of the chore worker was made out to the recipient who was responsible for paying the chore worker. There was no county policy against paying the chore worker directly if the recipient was physically incapable of this responsibility. The county had a long-standing substitute payee program which it used for IHSS clients. That program was used to pay chore workers in cases of recipient incapacity. When payments were made in this manner FICA taxes were withheld by the county.

The standard method of payment in Solano County was through an assignment. The recipient assigned his or her IHSS grant to the chore provider. The county would then pay the money directly to the chore worker. Less frequently, the county paid the money directly to the recipient. In these cases recipients were told to take care of income and social security taxes. However, if they were unable to do this, the social worker sometimes helped. The workers were never told that they should not provide this assistance.

The amount payable to chore providers was at an hourly rate fixed by the county but with a ceiling based on the recipient's maximum flat grant. In some cases, as set forth above, the total number of hours approved for the chore provider exceeded the capacity of the flat grant to pay out at the minimum wage or the prevailing wage rate set by the county. In Solano County the highest standard rate of pay at anytime during the period in question was $1.65 per hour. This continued to be the rate until the minimum wage order.

Each county had some method for periodic reassessment of recipient needs. This generally involved an in-home visit with the recipient, a reevaluation of services required by the recipient and the hours needed to perform them. On these and other occasions the social service worker would be called upon to determine the adequacy of the chore provider's work.

Social service workers sometimes received complaints from the recipient about the chore worker's performance. Sometimes they received complaints from the chore worker about the recipient. On still other occasions a social worker would observe inadequate performance which was condoned by the recipient. The general practice of the social workers in dealing with these problems was to encourage the recipient to handle them directly. However, when the recipient was unable or unwilling to do so, the social worker would intervene. Depending on the circumstances, this might involve talking with the chore worker, providing the assistance of a homemaker or seeking out an additional chore provider. In cases of serious inadequacy the chore provider might be fired. Again, the recipient was expected to do this. There were instances when this duty was performed by the social worker.

If the chore worker failed to show up for work a social worker might call the provider or try to track him or her down. There was a general concern among the social service workers that the client receive the services needed and that the chore workers not be paid for work not performed.

When a chore worker complained about the rate of pay or the amount of work to be done a social worker might try to increase the number of hours allowed to perform the work.

In Solano County, the Public Welfare Department through its accounting sections sent a notice to providers of chore services advising them that if they had any on-the-job problems they were to be worked out with the recipient. If they could not be resolved in this fashion they were advised to take the problems up with the social service worker. At times the chore providers contacted the social worker and received advice before the worker made any contact with or inquiry of the recipient.

There was also a period of time in Solano County when training was provided for the

134

chore workers. Homemakers who were county employees gave the instructions and in some cases were asked to assist the chore workers.

## CONCLUSIONS OF LAW

The legal issues before the court have been narrowed considerably since the time this action was filed in August 1975. In the interim, plaintiffs have filed several amended complaints and withstood a motion to dismiss based on the Supreme Court's holding in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) [*National League*], decided while this case was in progress. In June 1980, the court declined to resolve on motion for summary judgment, the legal issues of joint employment and application of *National League*, preferring to await a fully developed factual record. That record is now before the court.

## 1. JOINT EMPLOYMENT

It is first necessary to determine whether defendants are joint employers within the meaning of the Fair Labor Standards Act [FLSA], 29 U.S.C. § 203(d).[3] The definition

of "employer" has been codified to recognize the joint employment situation[4] and by its terms includes employ by public agencies. *Bonnette v. California Health & Welfare Agency*, 414 F.Supp. 212 (N.D.Cal.1976) (Carter, J.). Therefore defendants, if found to be employers, would be subject to the minimum wage provision of FLSA by virtue of a joint-employment relationship unless exempt under the terms of *National League*.[5]

The concept of joint employment under the FLSA is an expansive one and is to be applied with consideration given to the broad remedial purposes of the Act. *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748 (9th Cir. 1979); *Hodgson v. Ellis Transp. Co.*, 456 F.2d 937 (9th Cir. 1972). "The Act is designed to protect individuals whose employment status is so dependent on the whims of the employer as to make them submissive to an employer's notion of fair compensation for their labor." *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1315 (5th Cir.), *cert. denied*, 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976).

■ The question of whether a party is an employer or joint employer for purposes

3. " 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency ...." Fair Labor Standards Act, 29 U.S.C. § 203(d) (1978).

4. (a) A single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA] ... if the facts establish that the employee is employed jointly by two or more employers, i. e., that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the act. In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek.
(b) Where the employee performs work which simultaneously benefits two or more employers, ... a joint employment relationship generally will be considered to exist in situations such as:

．　　．　　．　　．　　．

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
(3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.
29 C.F.R. § 791.2 (1980) (footnotes omitted).

5. Contrary to defendants' assertions, plaintiffs do not contend that defendants lose exempt status by entering a joint-employment relationship with a non-exempt party. What plaintiffs do suggest is that because of a joint employment relationship, these public agencies are not engaged in governmental functions "essential to [their] separate and independent existence" and therefore cannot claim an exemption in the first place. (See discussion section II. *infra*.) Because defendants rely primarily on their inaccurate characterization of plaintiffs' joint employment argument, their attempt to distinguish plaintiffs' authorities in this regard are essentially unavailing.

of the Act is essentially one of fact. The determination is to be made from a consideration of the total employment situation and the economic realities of the work relationship rather than from formalistic labels, subjective intent, or a good-faith belief that an employer-employee relationship does not exist. *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); *Brennan v. Partida*, 492 F.2d 707 (5th Cir. 1974); *Hodgson v. Griffin & Brand, Inc.*, 471 F.2d 235 (5th Cir.), *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973); *Hodgson v. Ellis Transp. Co., supra; Hodgson v. Arnheim & Neely, Inc.*, 444 F.2d 609 (3d Cir. 1971), *rev'd on other grounds sub nom. Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973); *Shultz v. Mistletoe Express Serv., Inc.*, 434 F.2d 1267 (10th Cir. 1970); *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668 (5th Cir. 1968); *Stewart-Jordan Distr. Co. v. Tobin*, 210 F.2d 427 (5th Cir.), *cert. denied*, 347 U.S. 1013, 74 S.Ct. 866, 98 L.Ed. 1136 (1954); *Sims v. Parke Davis & Co.*, 334 F.Supp. 774 (E.D.Mich.), *aff'd* 453 F.2d 1259 (6th Cir. 1971), *cert. denied*, 405 U.S. 978, 92 S.Ct. 1196, 31 L.Ed.2d 254 (1972).

In *Hodgson v. Griffin & Brand, Inc.*, defendant, private owner of a fruit and vegetable warehouse and packing business, was found to be a joint employer of harvest workers even though the workers were selected, supervised and paid by crew leaders alleged to be independent contractors. The court emphasized that even if the crew leaders were independent contractors, defendant could still be jointly liable for violations of FLSA provisions if he also exercised sufficient control over the work relationship. In considering the entire employment situation, the court determined that although crew leaders made all direct contact with the workers, it was defendant who kept the workers' social security contribution records, provided forms to crew leaders on which to keep track of the number of baskets picked and employed field supervisors who instructed crew leaders on what fields to harvest and on the rate and method of payment.

Courts have looked to a number of factors in determining the existence of an employer-employee relationship under the FLSA. The most commonly relied upon indicia are whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *See, e. g. Sims v. Parke Davis & Co., supra; Stewart-Jordan Distr. Co. v. Tobin, supra; Wirtz v. Lone Star Steel Co., supra.*

■ Turning to the facts of the present case, the court believes and so finds that defendants are joint employers of plaintiff in-home service providers. In spite of formal labels and instructions to social service workers to consider recipients the actual employers,[6] the record shows that defendants exercised substantial control over all phases of the chore worker-recipient work relationship.

Social service workers worked with recipients to arrive at a mutually agreeable determination of needed services and hours. *See* Findings of the court. However when mutuality was not forthcoming, the county exercised its considerable authority in making a final decision. Defendants exercised complete control over the rate and method of payment and maintained extensive employment records. The social service workers had periodic and significant involvement in supervising the chore worker's job performance.

Considering the entire employment situation, the court finds that the counties' in-

---

**6.** Courts may take cognizance of who benefits from the work performed and look behind the formal structure to determine whether a party is impermissibly attempting to avoid responsibility as an employer under the FLSA. *See Stewart-Jordan Distr. Co. v. Tobin*, 210 F.2d 427, 432 (5th Cir.), *cert. denied*, 347 U.S. 1013, 74 S.Ct. 866, 98 L.Ed. 1136 (1954). While the recipient certainly benefits directly from the chore worker's services, defendants also gain significant advantage by avoiding the social and economic cost of institutionalization.

volvement in and ultimate authority over the participation of chore workers in the IHSS program brings them within the definition of joint employer for purposes of the FLSA.[7] This conclusion of necessity brings the State of California within the ambit of the FLSA provisions. Various state agencies were responsible for establishing methods by which counties could deliver in-home services, issuing guidelines for administration of the program and for disbursing state funds pursuant to county plans submitted for state approval.

## 2. EXEMPTION

Because defendants are joint-employers of plaintiff chore workers, they are bound by the wage-hour provisions of FLSA unless exempt under the reasoning of *National League*.

In *National League*, the Court struck down an attempt by Congress under its Commerce Clause authority to extend the provisions of the FLSA to state employees and employees of state political subdivisions. Relying largely on the Tenth Amendment, the Court sought to preserve traditional aspects of state sovereignty from federal encroachment. The power to set minimum wage/hour standards was seen as one attribute of this sovereignty. The question posed by the Court was whether the determination of wage/hour provisions is a function "essential to separate and independent existence" of the state. The Court held that "insofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. I, § 8, cl. 3."

In the recent case of *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*, —— U.S. ——, 101 S.Ct. 2352, 69 L.Ed.2d 1, (1981), the Court explained the reasoning of *National League* as a three part test for determining whether congressional legislation is an invalid exercise of its commerce power. To invalidate congressional action, the challenging party must show that

1.  the challenged statute regulates the "states as States",

2.  the federal regulation addresses matters that are indisputably "attributes of state sovereignty", and

3.  the states' compliance with the federal law would directly impair their ability "to structure integral operations in areas of traditional functions."

*Id.* at 2358–2359.

Turning to the facts of the present case, it is beyond dispute that the challenged Act is directed to the "states as states". Defendants seek to invalidate the very same enactments as were at issue in *National League*. It is a closer question whether providing in-home domestic services to public assistance recipients is an "indisputable attribute of state sovereignty".

In *National League*, the Court cited fire prevention, police protection, sanitation, public health and parks and recreation as examples of "line and support activities which are well within the area of traditional operations of state and local governments." *National League*, 426 U.S. at 851 & n.16, 96 S.Ct. at 2474 & n.16. A number of courts have since defined a variety of "integral government functions." *E. g., NLRB v. Highview, Inc.*, 590 F.2d 174 (5th Cir.), *enforcement modified*, 595 F.2d 339 (1979) (the care of the aged, sick and indigent); *Amersbach v. City of Cleveland*, 598 F.2d 1033 (6th Cir. 1979) (operation of a municipal airport); *United States v. Best*, 573 F.2d 1095 (9th Cir. 1978); *Williams v. Eastside Mental Health Center, Inc.*, 509 F.Supp. 579 (D.C.Ala.1980) (operation of nonprofit community mental health center); *Hewlett-Packard Co. v. Barnes*, 425 F.Supp. 1294 (N.D.Cal.1977), *aff'd* 571 F.2d 502 (9th

---

**7.** A different result might attend in a situation where an occasional social service worker acted contrary to explicit instructions regarding his or her authority over hiring and supervision. However that is not this case. The structure and purpose of the program itself creates the need for close county involvement in the recipient-chore worker relationship.

Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978). *Contrast Standard Oil Co. v. Agsalud*, 442 F.Supp. 695 (N.D. Cal.1977), *aff'd* 9 Cir., 633 F.2d 760 (1980) (state regulation of private employee benefit plans not subject to *National League* protection).

Assuming without deciding that providing in-home domestic services to public assistance recipients is an integral *state*[8] governmental function, this court finds that applying the FLSA provisions in the present circumstances will not impair the state's ability to structure essential operations nor significantly encroach on state sovereignty.

The court is well aware that unlike other recent cases interpreting and applying the edict of *National League* and its progeny, the present challenge goes to the very same enactment successfully challenged in *National League*. This commonality of issues makes it tempting to conclude that applying the FLSA to the present situation is likewise an impermissible impairment of the state's "integrity or [its] ability to function effectively in a federal system." *Hewlett-Packard, supra* at 1301, n.19. However the court believes it does a disservice to the meaning and spirit of *National League* to apply its holding in mechanical fashion.

In *National League*, the Court examined the potential effects of the wage and hour provisions on state autonomy. The Court noted a number of effects that cumulatively were judged to create the impermissible intrusion:

1. a substantial increase in dollar costs exerting "a significant impact on the functioning of the governmental bodies involved," *id.*, 426 U.S. at 846, 96 S.Ct. at 2471;

2. "forced relinquishment of important governmental activities" because of increased costs, *id.* at 847, 96 S.Ct. at 2472;

3. the displacement of "state policies regarding the manner in which they will structure delivery of those governmental services which their citizens require," *id.*; and

4. disruption "of accepted employment practices in many governmental areas where the demand for a number of employees to perform important jobs for extended periods on short notice can be both unpredictable and critical," *id.* at 850, 96 S.Ct. at 2473.

*See Friends of the Earth v. Carey*, 552 F.2d 25, 37 (2d Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977).

When these potential outcomes are compared to the actual practice in the present case, it becomes apparent that applying FLSA provisions in these unique circumstances does little to impair state sovereignty or to disrupt the state's ability to structure the IHSS program. Although application of the FLSA provisions will involve modest expenditures from the state treasury, it cannot be said that such increase will have significant impact.[9] In 1976, a minimum wage order was issued by the State Department of Industrial Relations and extended by the State Department of Health to domestic workers such as plaintiffs. The state itself made the determination that the in-home support service program would not be jeopardized or forced to restructure by the provision of minimum wage benefits. The state was not forced to curtail the scope of the program by adoption of the minimum wage. The state, by its own admission, was not significantly troubled by the cost of a program premised on minimum wage rates. Prior to the 1976 order, some chore workers did receive minimum wage either because the number of hours worked was low enough to provide minimum wage out of a flat grant, or be-

---

**8.** This case and a number of others do not clearly distinguish whether a certain service is integral to state government or to federal. A determination that a service is an attribute of state sovereignty and that it is an "integral government function" are not necessarily synonymous.

**9.** In fact, the state contends it has a cause of action over for reimbursement by the federal defendant, an issue that was not raised in this case by a third-party claim by the state defendants. That contention must await another action if it is to be raised.

cause they were providing in-home services via a civil service system or by county contract.[10]

Consideration of the nature of the IHSS program further demonstrates that while providing in-home care to public assistance recipients might be characterized as a traditional government function, state sovereignty is not impermissibly compromised by assuring minimum wage to the home-care providers. The IHSS program carries on a tradition of federal-state cooperation in the provision of services. *See King v. Smith*, 392 U.S. 309, 316, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968).[11] Title XX, 42 U.S.C. § 1397 *et seq.* sets forth specifications for the structure, implementation and monitoring of the support service program. Once a state chooses to participate in the program, it becomes subject to these federal requirements. By enacting Welfare and Institutions Code §§ 12250–12308, California voluntarily entered a federal-state partnership for the provision of in-home care. The IHSS program is one largely structured and funded according to federal regulation.[12] It is incongruous for defendants now to invoke the reasoning of *National League* in arguing that additional federal regulation of the IHSS program—application of the FLSA—directly impairs its ability to structure integral operations in an area of traditional function or impairs its "ability to function effectively in a federal system." *National League, supra*, 426 U.S. at 852, 96 S.Ct. at 2474 *citing Fry v. United States*, 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 1796 n.7.

Additional justification for denying an exemption in the present case is found in an analysis of the relative state and federal interests served by the structure and procedures of the IHSS program. While limiting the ability of Congress to regulate certain aspects of state functioning, the *National League* Court recognized the necessity for a balance between competing federal and state interests. *National League, supra*, at 856, 96 S.Ct. at 2476 (Blackmun, J., concurring). This balancing approach has been noted in a number of subsequent cases. *E. g., Amersbach v. City of Cleveland, supra*, at 1036 n.5; *Friends of the Earth v. Carey, supra* at 37; *Usery v. Board of Education*, 421 F.Supp. 718 (D.Utah 1976).

■ A balancing test necessarily rests upon a comparison of competing interests. An examination of competing federal and state interests convinces the court that the state interest in denying certain chore workers minimum wage is insufficient to overcome the significant federal interest involved here and invoke the limitations of *National League*. The express goals of the IHSS program are to avoid costly institutionalization of the elderly, blind and disabled. Extending the provisions of the FLSA to domestic workers was intended to improve the status of this occupation and provide a reasonable wage, thus insuring the proper functioning of the federal in-home program. *See* H.R.Rep.No.93–913, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Ad.News 2811, 2843, 2845. While these objectives benefit both state and federal government, the federal financial investment in the program far outweighs that of the state. At the

---

**10.** Additionally, retroactive application of the FLSA provisions during the relevant time-period will affect only a small and finite group of workers. The statute of limitations has run on unfiled claims, *see* 29 U.S.C. § 255, and the present action is brought by only a small number of individual plaintiffs.

**11.** The U.S. Department of Health, Education and Welfare, the State Department of Health, and the 58 counties of California together constitute a vast and complex financial and administrative partnership, under Federal and State law, responsible for the $380,000,-000 per year program of social services throughout the State. Crucial to the partner-

ship is a meaningful role by all three partners in policy formulation affecting these services. Pls. Exhibit A–8, In-Home Supportive Services, Report of the California State Benefits and Services Advisory Board Task Force, Dec. 1977, at 43.

**12.** This program is in contrast to the mental health centers considered in *Williams v. Eastside Mental Health Center, Inc.*, 509 F.Supp. 579 (D.C.Ala.1980). That program did not involve the substantial federal funding and regulation associated with federal public assistance grants.

same time, the state's interest in avoiding the application of the FLSA provisions to the IHSS program is minimal. As discussed above, the majority of IHSS workers did receive minimum wage and the entire program was created and premised on substantial federal involvement. Application of the FLSA displaces no state choices on how to structure the IHSS program.

Therefore, the court finds that defendants are joint employers within the meaning of the FLSA and that defendants have not demonstrated sufficient grounds to exempt them from the provisions of the Act as applied to these plaintiffs.

Judgment will be entered in favor of plaintiffs upon a hearing or the submission of a stipulated order on the issue of damages.[13]

Third-party claims were made by the county defendants against the United States Department of Health, Education and Welfare and F. David Matthews. No third-party claim was made against the federal defendants by the state or by state defendants Obledo and Myers. An order was entered earlier in this action severing the third-party claims against the federal defendants until such time as the liability phase was resolved. The counties having no claims against the federal defendants by reason of the state defendants having consented to payment, and the state having failed to make such a claim, all claims against the federal defendants are dismissed.

For the foregoing reasons, it is hereby ordered that judgment shall be entered in favor of the plaintiffs against the defendants as follows:

1. Eleanor Bonnette shall recover damages in the amount of $3,001.54 against Solano County Public Welfare Department and Crawford Tucker, and California Health and Welfare Agency and Mario Obledo, and California Department of Health and Beverlee Myers, and California Department of Social Services and Marion Woods;

2. Faye Pryor shall recover damages in the amount of $147.20 against Solano County Public Welfare Department and Crawford Tucker, and California Health and Welfare Agency and Mario Obledo, and California Department of Health and Beverlee Myers, and California Department of Social Services and Marion Woods;

3. Vickie Young shall recover damages in the amount of $764.66 against Solano County Public Welfare Department and Crawford Tucker, and California Health and Welfare Agency and Mario Obledo, and California Department of Health and Beverlee Myers, and California Department of Social Services and Marion Woods;

4. Joanne R. Cordone shall recover damages in the amount of $105.00 against Solano County Public Welfare Department and Crawford Tucker, and California Health and Welfare Agency and Mario Obledo, and California Department of Health and Beverlee Myers, and California Department of Social Services and Marion Woods;

5. Marjorie Marshall shall recover damages in the amount of $702.60 against Solano County Public Welfare Department and Crawford Tucker, and California Health and Welfare Agency and Mario Obledo, and California Department of Health and Beverlee Myers, and California Department of Social Services and Marion Woods;

6. Amelia Walker shall recover damages in the amount of $291.04 against Solano County Public Welfare Department and Crawford Tucker, and California Health and Welfare Agency and Mario Obledo, and California Department of Health and Beverlee Myers, and California Department of Social Services and Marion Woods;

7. Thet Poy Chung shall recover damages in the amount of $13,269.12 against San Francisco County Department of Social Services and Edwin Sarsfield, and California Health and Welfare Agency and Mario

13. The parties have entered into a stipulation as to the amount of damages and the state defendants have consented to make payment in full of those damages without admitting liability or waiving any right to appeal the liability issue. The damage amounts set forth in this order are those stipulated to by the parties.

Obledo, and California Department of Health and Beverlee Myers, and California Department of Social Services and Marion Woods;

8. Elizabeth Tears shall recover damages in the amount of $173.64 against Sacramento County Department of Social Welfare and William Redmond, and California Health and Welfare Agency and Mario Obledo, and California Department of Health and Beverlee Myers, and California Department of Social Services and Marion Woods.

IT IS FURTHER ORDERED that the third-party claims of defendants Solano County Public Welfare Department and Crawford Tucker, San Francisco County Department of Social Services and Edwin Sarsfield, and Sacramento County Department of Social Welfare and William Redmond against the United States Department of Health, Education and Welfare and F. David Matthews are hereby dismissed with prejudice.